No. 13-1766(L)
Cons. with Nos. 13-1974 and 13-2279

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

REDNER'S MARKETS, INC.

Plaintiff-Appellee/Cross-Appellant,

v.

JOPPATOWNE G.P. LIMITED PARTNERSHIP,

Defendant – Appellant/Cross-Appellee.

On appeal from the United States District Court
For the District of Maryland (Case No. 1:11-cv-01864-RDB)

OPENING BRIEF OF APPELLEE/CROSS-APPELLANT,
REDNER'S MARKETS, INC.

FOX ROTHSCHILD LLP

January 29, 2014

John J. Miravich, Esquire
Admitted to the Fourth Circuit
747 Constitution Drive, Suite 100
Exton, PA 19341
Phone: (610) 458-3128
Fax: (610) 458-7337
jmiravich@foxrothschild.com
*Attorneys for Plaintiff-Appellee/Cross-Appellant, Redner's Markets, Inc.*

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

Pursuant to Federal Rule of Appellate Procedure 26.1 and Local Rule 26.1,

Appellee/Cross-Appellant makes the following disclosures:

1.      Redner's Markets, Inc. ("Redner's"), is not a publicly held

corporation or other publicly held entity.

2.      Redner's has no parent corporations.

3.      Ten percent or more of Redner's stock is not owned by a publicly held

corporation or other publicly held entity.

4.      No publicly held corporation or other public entity has a direct

financial interest in the outcome of the litigation (Local Rule 26.1(b)).

5.      Redner's is not a trade association.

6.      This case does not arise out of a bankruptcy proceeding.

**FOX ROTHSCHILD LLP**

Dated:  January 29, 2014               By:  */s/ John J. Miravich*_____
                                                John J. Miravich, Esquire
    Admitted to the Fourth Circuit
    747 Constitution Drive, Suite 100
    Exton, PA  19341
    Phone: (610) 458-3128
    Fax: (610) 458-7337
    jmiravich@foxrothschild.com
    *Attorneys for Plaintiff-*
    *Appellee/Cross-Appellant,*
    *Redner's Markets, Inc.*

# TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ......................................................... 1

STATEMENT OF ISSUES APPEALED ................................................. 2

STATEMENT OF THE CASE ............................................................... 3

STATEMENT OF FACTS ..................................................................... 4

    A.   The Parties ............................................................................ 4
    B.   The Lease .............................................................................. 4
    C.   The Restrictive Use Covenant ............................................. 5
    D.   Joppatowne Acknowledged Its Awareness And
         Understanding Of The Restrictive Use Covenant. ............... 6
    E.   The Gas Station And Lease Amendment ............................. 7
    F.   The Parties Agreed That Redner's Would Pay No Rent
         For The Gas Station ............................................................. 8
    G.   Joppatowne Breached The Restrictive Use Covenant. ...... 10
    H.   The Farmer's Market Vendors ........................................... 11
    I.   The Vendors Chose Not To Join In This Litigation ........... 13
    J.   Redner's Damages .............................................................. 14

SUMMARY OF ARGUMENT ............................................................ 16

    Redner's Arguments On Appeal ................................................. 16
    Response To Joppatowne's Arguments On Appeal ..................... 17

ARGUMENT ..................................................................................... 18

I.    STANDARD OF REVIEW ......................................................... 18

II.   REDNER'S ARGUMENTS IN SUPPORT OF ITS APPEAL .................. 18

    A.   The District Court Erred By Precluding Redner's From
         Offering Damage Evidence Other Than Lost Profits ......... 18

         1.   Evidence of diminution in value of a leasehold
             interest is appropriate to remedy the breach of a
             restrictive use covenant ............................................... 19

i

2. The District Court improperly concluded that Redner's was not entitled to present additional damages evidence because Redner's did not establish lost profits. ................................................ 23

B. The District Court Erred By Not Defining "In-Store Sales Area" To Include All In-Store Areas Used For The Sale Of Merchandise. ................................................................ 24

1. The narrow definition of "in-store sales area" applied by the District Court renders the Restrictive Use Covenant meaningless. ................... 25

2. The logical definition of "in-store sales area," intended by the parties, includes all in-store areas used for the sale of merchandise. ........................... 27

C. The Area Around The "Island" Display In Beiler's Baked Goods Should Be Excluded From Its "Gross Floor Area." .............. 28

1. The District Court found that "Gross Floor Area" does not include any common areas. ....................... 29

2. Mr. Beiler testified that the area around Beiler's Baked Goods' island is a common area. ................. 30

3. Mr. Beiler testified that Beiler's Baked Goods pays rent on only 1,060 square feet. ............................... 30

D. Beiler's BBQ Violates The Restrictive Use Covenant Because It Is A Butcher Shop. ........................................ 31

1. The definition of "butcher shop" is broad and focuses on the sale of raw meat. .............................. 32

2. Beiler's BBQ sells multiple kinds and cuts of fresh raw poultry, and, therefore, is a "butcher shop." .................... 33

3. Redner's did not waive its claim that Beiler's BBQ violates the Restrictive Use Covenant because it is a butcher shop. ....................................................... 36

E. Redner's Was Not Required To Prove The Percentage Of Its Lost Profits Attributable To Joppatowne Or To

ii

Introduce Evidence Of The Vendors' Sales To Recover
Lost Profits. ........................................................................ 37

III.   REDNER'S ARGUMENTS IN OPPOSITION TO
JOPPATOWNE'S APPEALS ............................................................ 43

A.   The Vendors Are Not Indispensable Parties Because
They Are Not Persons To Be Joined If Feasible And
Their Interests Are Adequately Protected. ......................... 43

1.   Applicable Law ..................................................... 44
2.   The Vendors Are Not "Persons To Be Joined If
Feasible" Under Rule 19(a) ................................... 46

a.   The Vendors do not have "an interest
relating to the subject of the action." ........... 47
b.   Resolving this action in the Vendors'
absence will not impair their interests or
leave them at risk of inconsistent
obligations ..................................................... 48

3.   Regardless Of Whether The Vendors Are "Persons
To Be Joined If Feasible," This Action Should
Continue In The Vendors' Absence Because The
Vendors Are Not Indispensable Parties. ................ 50

a.   The judgment rendered in the Vendors'
absence did not prejudice the Vendors or the
existing parties (Rule 19(b)(1)). ................... 51
b.   Any prejudice was avoided by shaping the
relief appropriately (Rule 19(b)(2)). ............. 53
c.   The judgment rendered in the Vendors'
absence was adequate (Rule 19(b)(3)). ......... 54
d.   Redner's will not have an adequate remedy
if this matter is dismissed for nonjoinder
(Rule 19(b)(4)). ............................................. 56

4.   Joppatowne Waived Its Indispensable Party
Argument. ............................................................. 57

B.   Redner's Is Not Obligated To Pay Rent On Gas Sales. ...... 59

iii

C.  The District Court Properly Applied The Definitions Of "Butcher Shop" And "Seafood Shop" To Lapp's And All Fresh And These Terms Are Not Ambiguous................................... 65

  1.  Parol evidence should not be considered................................. 65
  2.  Parol evidence supports the District Court's ruling................. 67

D.  The District Court Properly Entered The Permanent Injunction, And Redner's Was Not Required To Prove Irreparable Harm. ........................................................................ 70

  1.  Applicable Law ....................................................................... 70

      a.  Maryland law applies..................................................... 70
      b.  Permanent injunctive relief........................................... 70
      c.  Specific performance..................................................... 71
      d.  The "irreparable harm" requirement is not applicable................................................................... 72

  2.  The District Court Properly Enjoined Joppatowne From Allowing The Infringing Vendors To Continue Operating. .................................................................. 73

      a.  Redner's succeeded on the merits. ................................ 73
      b.  Redner's was not required to show irreparable harm........................................................... 73
      c.  Although Redner's was not required to show irreparable harm, Redner's suffered irreparable harm........................................................... 74
      d.  Greater injury would have resulted from refusing the injunction than from granting it................. 76
      e.  An injunction was in the public interest. ...................... 77

IV.  CONCLUSION.......................................................................................... 79

LOCAL RULE 34(A) STATEMENT ............................................................. 80

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .................................... 81

iv

# TABLE OF AUTHORITIES

CASES
PAGE(S)

Arista Cards At Maspeth, Inc., v. FC Grand Ave. Assoc.,
   757 N.Y.S.2d 758 (N.Y. App. Div. 2003) ............................................19

Barr and Sons, Inc. of Cherry Hill, N.J. v. Cherry Hill Center, Inc.,
   217 A.2d 631 (N.J. Super. Ct. App. Div. 1966) ..................................19

Benger Labs., Ltd. v. R.K. Laros Co.,
   24 F.R.D. 450 (E.D. Pa. 1959).............................................................58

Burber v. Jilamb Prime Meat, Inc.,
   455 N.Y.S.2d 44 (N.Y. Ct. Cl. 1982) ......................................31, 32, 36

Capital Tool & Manufacturing Co., Inc. v. Maschinenfabrik Herkules,
   837 F.2d 171 (4th Cir. 1988) ...............................................................70

Caterpillar Inc. v. Lewis,
   519 U.S. 61 (1996)..........................................................................58, 59

Chernick v. Chernick,
   610 A.2d 770 (Md. 1992) .....................................................................62

Chestnut Real Estate Partnership v. Huber,
   811 A.2d 389 (Md. Ct. Spec. App. 2002).................................71, 72, 73, 74, 78

Confederated Tribes of Chehalis Indian Reservation v. Lujan,
   928 F.2d 1496 (9th Cir. 1991) .............................................................44

David Sloane, Inc. v. Stanley G. House & Associates Inc.,
   532 A.2d 694 (Md. 1987) .....................................................................38

Ferrofluidics Corp. v. Advanced Vacuum Components, Inc.,
   789 F. Supp 1201 (D. N.H. 1992), *aff'd*
   968 F.2d 1463 (1st Cir. 1992)...........................................44, 50, 51, 52

Fister ex rel. Estate of Fister v. Allstate Life Ins. Co.,
   783 A.2d 194 (Md. 2001) .....................................................................65

v

Fontainbleau Hotel Corp. v. Crossman,
  323 F.2d 937 (5th Cir. 1963) ............................................. 18, 19, 20, 22, 23, 24

Freedman v. Seidler,
  194 A.2d 778 (Md. 1963) ...................................................................71

General Drivers, Warehousemen and Helpers Local Union No. 509 v. Ethyl
  Corp.,
  68 F.3d 80 (4th Cir. 1995) ..............................................................25, 26

General Parts Distribution, LLC v. St. Clair,
  No. 11–cv–03556–JFM, 2011 WL 6296746 (D. Md. Dec. 14, 2011) .........74, 75

Genesco Inc. v. Monumental Life Ins. Co.,
  577 F. Supp. 72 (D.S.C. 1983) ............................................................21

Gordon v. Service of America,
  No. 95-3162, 1997 WL 414371 (4th Cir. Jul. 23, 1997) ....................................65

Herman Miller, Inc. v. Thom Rock Realty Co.,
  46 F.3d 183 (2d Cir. 1995) ......................................................19, 20, 21, 23, 24

Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.,
  389 A.2d 887 (Md. 1978) ..................................................................41

Janney Montgomery Scott, Inc. v. Shepard Niles, Inc.,
  11 F.3d 399 (3d Cir. 1993) ..............................................................48, 49

Keffer v. H.K. Porter Co., Inc.,
  872 F.2d 60 (4th Cir. 1989) ..............................................................25, 28

Lawler v. Schumacher Filters America, Inc.,
  832 F. Supp. 1044 (E.D. Va. 1993) .........................................................27

Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc.,
  43 F.3d 922 (4th Cir. 1995) ...............................................................18

Lopez v. XTEL Construction Group, LLC,
  796 F. Supp. 2d 693 (D. Md. 2011)........................................................61

M & R Contractors & Builders, Inc. v. Michael,
  138 A.2d 350 (Md. 1958) ...............................................................38, 41

vi

McGovern v. Deutsche Post Global Mail, Ltd.,
    No. Civ. JFM-04-0060, 2004 WL 912843 (D. Md. 2004) ................................53

McLeod v. Stevens,
    617 F.2d 1038 (4th Cir. 1980) ............................................................................70

Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.,
    22 F.3d 546 (4th Cir. 1994) .................................................. 22, 24, 74, 75, 76, 77

Nat'l Micrographics Sys., Inc. v. OCE-Industries, Inc.,
    465 A.2d 862 (Md. Ct. Spec. App. 1983).........................................38, 39, 40, 42

Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of South Carolina,
    Inc.,
    210 F.3d 246 (4th Cir. 2000) ..............................................................................46

Nenr Investments, LLC v. Starbucks Corp.,
    No. 1:08cv00047, 2009 WL 1404732 (W.D. Va. May 18, 2009).....................21

Newman-Green, Inc. v. Alfonzo-Larrain,
    490 U.S. 826 (1989).......................................................................................58, 59

Owens-Illinois, Inc. v. Meade,
    186 F.3d 435 (4th Cir. 1999) ....................................................................46, 53, 55

Pa. Nat'l Mut. Cas. Ins. Co. v. Perlberg,
    268 F.R.D. 218 (D. Md. 2010) ......................................................................54, 55

Paper Exp., Ltd. v. Pfankuch Maschinen GmbH,
    972 F.2d 753 (7th Cir. 1992) ..............................................................................27

Principal Life Ins. Co. v. DeRose,
    No. 1:08-CV-2294, 2012 WL 1642606 (M.D. Pa. May 10, 2012) ..............58, 59

Provident Tradesmens Bank & Trust Co. v. Patterson,
    390 U.S. 102 (1968).................................... 44, 46, 47, 48, 49, 52, 53, 54, 56, 57

Quorum Health Resources, LLC v. Hugh Chatham Memorial Hosp., Inc.,
    552 F. Supp. 2d 527 (M.D. N.C. 2007) .......................................................25, 28

Ripley Manu. Corp. v. Roosevelt Field, Inc.,
    238 N.Y.S.2d 133 (N.Y. App. Div. 1963)..........................................................20

vii

<u>Slice v. Carozza Properties, Inc.</u>,
   137 A.2d 687 (Md. 1958) ........................................................71

<u>Thomas v. Capital Medical Man. Assoc., LLC</u>,
   985 A.2d 51 (Md. Ct. Spec. App. 2009)................................38, 39, 41

<u>Williams v. Sandman</u>,
   187 F.3d 379 (4th Cir. 1999) ...............................................18

<u>WMX Technologies, Inc. v. Jackson</u>,
   168 F.R.D. 64 (M.D. Ala. 1996)............................................48

STATUTES

28 U.S.C. § 1292 ................................................................1
28 U.S.C. § 1291 ................................................................1

OTHER AUTHORITIES

BLACK'S LAW DICTIONARY (8th Ed., 2004)..................................28

C. Wright & A. Miller, 7 Federal Practice & Procedure § 1613 ...........50

Collins' English Dictionary ...............................................33

Fed. R. App. P. 32(a)(5).....................................................81

Fed. R. App. P. 32(a)(6).....................................................81

Fed. R. App. P. 32(a)(7)(B), 32(a)(7)(C).....................................81

Fed. R. Civ. P. 19(a)(1)..................................... 43, 44, 45, 46, 47, 48, 49, 50

Fed. R. Civ. P. 19(a)(1)(B)(i)-(ii) .....................................45, 48

Fed. R. Civ. P. 19(b) ....................................... 45, 46, 50, 54, 56, 59

Fed. R. Civ. P. 12(h) ....................................................57, 58

Fed. R. Civ. P. 52(a)........................................................18

Local Rule 28.1(e)(2)(B) ....................................................81

Local Rule 34(A) ............................................................80

viii

Local Rule 32(a)...............................................................................81

Restatement (Second) of Contracts § 203(a) .......................................25

The Free Dictionary ...........................................................................32

http://www.collinsdictionary.com/dictionary/english/butcher-s-shop ...................33

http://www.thefreedictionary.com/butcher+shop ...................................32

ix

## JURISDICTIONAL STATEMENT

Three appeals are at issue.  First, under Docket No. 13-2279, Redner's cross-appeals pursuant to 28 U.S.C. §§ 1291 and 1292 from three decisions of the District Court in Docket No. 1:11-cv-01864 RDB:

- January 24, 2013 Opinion of Judge Benson E. Legg;

- July 11, 2013 Opinion of Judge Richard D. Bennett entering final judgment; and

- September 17, 2013 Opinion of Judge Richard D. Bennett granting in part and denying in part Redner's motion to amend findings of facts and conclusions of law.

Second, under Docket No. 13-1766(L), Joppatowne appeals pursuant to 28 U.S.C. § 1292 from the June 13, 2013 Opinion of the District Court granting Redner's motion for a permanent injunction.

Third, under Docket No. 13-1974, Joppatowne appeals pursuant to 28 U.S.C. § 1291 from (1) the September 17, 2013 Opinion of the District Court granting in part and denying in part Redner's motion to amend findings of facts and conclusions of law; and (2) the July 11, 2013 Opinion entering final judgment.

1

## STATEMENT OF ISSUES APPEALED

(1)    Did the District Court err in finding that Redner's waived its right to present damages evidence?

(2)    Did the District Court err in interpreting the meaning of "in-store sales area," as used in the lease between the parties?

(3)    Did the District Court err in finding that the area around the "island display" in Beiler's Baked Goods was included within its "gross floor area" within the meaning of the lease between the parties?

(4)    Did the District Court err in finding that Beiler's BBQ is not a "butcher shop" within the meaning of the lease between the parties?

(5)    Did the District Court apply an incorrect legal standard in denying Redner's lost profit damages?

2

## <u>STATEMENT OF THE CASE</u>

Redner's filed this lawsuit against its landlord, Joppatowne G.P. Limited Partnership ("Joppatowne"), to enforce a restrictive use covenant in a commercial lease, which the parties intended to protect Redner's from destructive competition. In 2011, without notice to Redner's, Joppatowne allowed a farmer's market to open in the Redner's shopping center in direct competition with Redner's grocery store in violation of the restrictive use covenant.

After over two years of litigation, the District Court granted a permanent injunction on June 13, 2013, directing Joppatowne to cause a butcher shop (Lapp's Fresh Meats, LLC) and a seafood shop (All Fresh Quality Seafood and Produce) in the farmer's market to close. On July 11, 2013, the District Court entered final judgment, concluding that Joppatowne violated the restrictive use covenant, but awarding no monetary damages to Redner's. Joppatowne appealed the entry of the permanent injunction and the final judgment. Redner's filed a motion for amended findings of fact and conclusions of law, which the District Court granted in part and denied in part, awarding Redner's nominal damages. Redner's also appeals the judgment of the District Court.

3

## STATEMENT OF FACTS

### A.    The Parties

Redner's is an employee-owned corporation that operates 44 "warehouse markets" in the Mid-Atlantic region, extending from Pennsylvania, in the north, to Baltimore, Maryland, in the south.[1]  Redner's sells grocery products, including baked goods, canned and dried goods, produce, and dairy products, and operates a butcher shop and deli.[2]

Joppatowne is the landlord of a shopping center located on Route 40 in Joppa, Maryland (the "Shopping Center").[3]

### B.    The Lease

On November 23, 2005, Redner's and Joppatowne entered into a commercial lease for Redner's to operate an anchor grocery store in the Shopping Center (the "Lease").[4]  Since opening, Redner's has complied with the Lease, which extends through December 31, 2025.[5]

---

[1] See Joint Appendix ("J.A.") Vol. VI, pp. 2455-2456.
[2] See J.A. Vol III, pp. 807-808.
[3] See J.A. Vol. VI, p. 2456.
[4] See J.A. Vol. X, Joint Exhibit 12, pp. 3902-3972.
[5] See id., pp. 3913-3916.

ACTIVE 24612840v1 01/29/2014

Over the life of the Lease, Redner's will pay over $12,000,000.00 to Joppatowne for the space.[6]  Redner's agreed to pay these substantial sums largely because Joppatowne agreed that Redner's would be the **only** grocery store in the Shopping Center.[7]

## C.     The Restrictive Use Covenant

Pursuant to Section 12.01 of the Lease (titled "Use"), the parties intended to provide space to Redner's for "the conduct of a twenty-four (24) hour retail grocery supermarket and related uses."[8]

Section 13.01 of the Lease explicitly prohibits the following stores within Shopping Center (collectively, the "Restrictive Use Covenant"):

- "Landlord hereby covenants that it shall not lease to, use, or permit to be used or otherwise allow any portion of the Shopping Center . . . to be used as a **food supermarket, butcher shop, seafood shop, or 'grocery store.'**"[9]

- Any retail operator in the Shopping Center whose Gross Floor Area is 15,000 square feet or less and whose in-store sales areas offering canned foods, fresh-baked bakery items; baking ingredients; fresh or frozen meats and deli items; fresh uncooked fruits and vegetables; ice cream, frozen vegetables and frozen prepared foods; milk and milk products, butter, eggs and cheese; and pet foods that exceed, in the

_____

[6]See J.A. Vol. X, Joint Exhibit 12, pp. 3913-3916.
[7]See id., pp. 3938-3940.
[8]See id., p. 3934.
[9]See id., p. 3938 (emphasis added).

aggregate, twenty-five percent (25%) of such retail Operator's Gross Floor area.[10]

Section 13.01 also identified other "retail operators" restricted from selling grocery store products, according to their respective sizes.[11]

Diane Herr, then Manager of Real Estate for Redner's ("Ms. Herr"), testified that the Restrictive Use Covenant was heavily negotiated.[12] Robert Fowler, Esquire, the lease negotiator for Joppatowne, agreed that the parties exchanged numerous draft leases and both sides proposed and modified terms in the Restrictive Use Covenant.[13]

## D. Joppatowne Acknowledged Its Awareness And Understanding Of The Restrictive Use Covenant.

After securing Redner's agreement to the Lease, Joppatowne solicited a Super Wal-Mart as an additional tenant for the Shopping Center.[14] By e-mail dated January 27, 2009, Joppatowne asked Redner's to waive the heavily negotiated Restrictive Use Covenant to allow the Super Wal-Mart to open in the Shopping Center.[15] The proposed Super Wal-Mart intended to sell food products identical to

---

[10]See J.A. Vol. X, Joint Exhibit 12, pp. 3938-3939.
[11]See id., pp. 3938-3940.
[12]See J.A. Vol. III, pp. 812-826.
[13]See id., pp. 1103-1105.
[14]See id., pp. 827-829.
[15]See id., pp. 827-831; see also Plaintiff's Exhibit 2.

6

Redner's products.[16]  In its letter, Joppatowne acknowledged Redner's authority to approve or disapprove of a competing store under the Lease:  "The purpose of this letter is to request that Redner's allow us to attempt to enter into a lease with Wal-Mart at Joppatowne Plaza for a Supercenter."[17]

On January 28, 2009, Redner's denied Joppatowne's request.[18]  In doing so, Redner's explained to Joppatowne the significance of the Restrictive Use Covenant to the sustainability of Redner's business.[19]

## E.    The Gas Station And Lease Amendment

After the parties signed the Lease, Joppatowne fell behind on the scheduled construction of Redner's store.[20]  Consequently, Redner's could have terminated the Lease.[21]  Instead of terminating, however, Redner's accommodated Joppatowne and negotiated an amendment to the Lease (the "Lease Amendment"), dated November 20, 2006, which permitted Redner's to construct a gas station in the

---

[16]See J.A. Vol. III, pp. 827-831.
[17]See Plaintiff's Exhibit 2.
[18]See J.A. Vol. III, pp. 830-831; see also Plaintiff's Exhibit 3.
[19]See Plaintiff's Exhibit 3.
[20]See J.A. Vol. V, p. 1927.
[21]See id.; J.A. Vol. X, Joint Exhibit 12, pp. 3902-3972.

7

Shopping Center parking lot.[22]  Redner's agreed to pay for the construction of the gas station, and Joppatowne agreed to charge no rent for the gas station.[23]

## F. The Parties Agreed That Redner's Would Pay No Rent For The Gas Station.

On March 10, 2006, during the Lease Amendment negotiations, Joppatowne's counsel agreed in writing that Redner's would pay "no additional rental costs" for the gas station (the "Letter Agreement").[24]  Redner's President responded by stating. "I also want to thank you for your willingness to allow Redner's to construct gas pumps at **no additional rental costs to Redner's**."[25] Joppatowne's counsel, Mr. Fowler, signed the Letter Agreement, and the parties incorporated it into the Lease Amendment.[26]

The Lease Amendment contains no provisions for the payment of any monies (e.g., rent or percentage rent) to Joppatowne, except that it requires Redner's to pay any increases in Joppatowne's real estate taxes caused by the gas

---

[22]See J.A. Vol. X, Joint Exhibit 14, pp. 3975-3990; J.A. Vol. V, pp. 1837-1840.
[23]See J.A. Vol. V, pp. 1928-1932; J.A. Vol. X, Joint Exhibit 13, pp. 3973-3974; J.A. Vol. VIII, Plaintiff's Exhibit 40, pp. 3451-3452; J.A. Vol. VIII, Plaintiff's Exhibit 45, pp. 3473-3475; J.A. Vol. VIII, Plaintiff's Exhibit 46, pp. 3476-3477.
[24]See J.A. Vol. X, Joint Exhibit 13, pp. 3973-3974; J.A. Vol. V, pp. 2071-2072.
[25]See J.A. Vol. X, Joint Exhibit 13, pp. 3973-3974 (emphasis added); J.A. Vol. V, pp. 2071-2072.
[26]See J.A. Vol. X, Joint Exhibit 14, p. 3975; J.A. Vol. V, pp. 2071-2072.

8

station.[27]  The Lease Amendment concludes:  "All other terms, covenants

provisions and conditions set forth in the Lease and the Letter Agreement are

hereby reaffirmed in their entirety, except as expressly modified by the terms of

this Amendment No. 1 to Lease."[28]

Earlier in this lawsuit, at a deposition of Ms. Herr, Joppatowne's counsel

acknowledged that Redner's had no rent obligation whatsoever under the Lease

Amendment:[29]

> ATTORNEY KERR:  Okay.  I'm correct, am I not, that
> by this amendment Redner's obtained the consent of the
> landlord, Joppatowne, to put in a gasoline vending
> facility in the parking lot in front of its grocery store?
>
> MS. HERR:  Yes.
>
> ATTORNEY KERR:  Okay.  **Am I correct that no
> additional rent was required of Redner's in
> consequence of this amendment to which the landlord
> agreed?**
>
> MS. HERR:  **Correct.**[30]

This exchange seemed insignificant at the time because Redner's had never paid,

and Joppatowne had never requested, any rent (annual or percentage) for the gas

station.[31]

-------------------

[27]See J.A. Vol. X, Joint Exhibit 14, pp. 3975-3990.
[28]See id., pp. 3987-3988.
[29]See J.A. Vol. V, pp. 1907-1916.
[30]See id., pp. 1914-1915 (emphasis added).

9

After the grocery store and gas station opened, Redner's paid annual rent, maintenance charges, and percentage rent under the Lease (although sales were not high enough to meet the threshold for percentage rent in the first few years).[32] Redner's paid nothing to Joppatowne under the Lease Amendment.[33] Joppatowne did not raise this as an issue until well after Redner's filed this lawsuit.[34]

## G.    Joppatowne Breached The Restrictive Use Covenant.

On March 2, 2011, Redner's discovered that Joppatowne allowed the farmer's market into the Shopping Center.[35] That same day, Ms. Herr wrote to Joppatowne, requesting information and reminding Joppatowne of the Restrictive Use Covenant.[36] The farmer's market opened for business on March 17, 2011.[37]

Joppatowne never notified Redner's of its intent to lease space to the farmer's market.[38] Yet, as set forth below, the Restrictive Use Covenant was of such concern to Joppatowne and its tenant that the tenant required Joppatowne to

---

[31]See J.A. Vol. IV, Document No. 100-7, p. 1639.
[32]See id., Document No. 24-7, pp. 1695-1711.
[33]See id., Document No. 100-7, p. 1639.
[34]See id., pp. 1594-1661.
[35]See J.A. Vol. III, pp. 832-837.
[36]See J.A. Vol. X, Joint Exhibit 22, pp. 4043-4046.
[37]See J.A. Vol. VI, p. 2458.
[38]See J.A. Vol. III, pp. 832-837.

10

agree to indemnify and defend it against any legal action brought by Redner's arising out of the Restrictive Use Covenant.[39]

By letter dated March 16, 2011, Redner's notified Joppatowne that it was in default under the Lease because of the farmer's market.[40] Joppatowne did not respond.[41] By letter dated April 5, 2011, Redner's again notified Joppatowne that the farmer's market constituted a default under the Lease.[42] Joppatowne again failed to respond.[43]

## H.    The Farmer's Market Vendors

On October 21, 2009, Joppatowne leased approximately 108,000 square feet of space in the Shopping Center to J.T.F., LLC ("JTF"),[44] who opened the Joppatowne Flea Market in this space in early 2010.[45] On December 2, 2010, JTF subleased 11,500 square feet of this space to a group of seven farmer's market vendors for a five-year term (the "Farmer's Market Lease").[46]

The seven vendors that executed the Farmer's Market Lease were:

(1) Lapp's Fresh Meats, LLC ("Lapp's"); (2) King's Cheese & Deli Meats;

---

[39]See J.A. Vol. X, Joint Exhibit 18, pp. 3998-4002.
[40]See id., Joint Exhibit 23, p. 4047.
[41]See J.A. Vol. III, pp. 838-839.
[42]See J.A. Vol. X, Joint Exhibit 24, pp. 4048-4050.
[43]See J.A. Vol. III, pp. 839-840.
[44]See J.A. Vol. X, Joint Exhibit 20, pp. 4006-4039; J.A. Vol. III, pp. 1059-1061.
[45]See J.A. Vol. VI, p. 2458.
[46]See J.A. Vol. VIII, Plaintiff's Exhibit 1, p. 3308; J.A. Vol. VI, pp. 2458-2459.

11

(3) Beiler's BBQ; (4) Beiler's Baked Goods; (5) Kreative Kitchen; (6) Dutch Delights; and (7) Dutch Pantry Fudge.[47]  These seven vendors operated within a fenced-in area of 11,231 square feet, located within the space leased by JTF from Joppatowne.[48]  These seven vendors are from Pennsylvania,[49] and, combined with All Fresh Seafood and Produce ("All Fresh"), comprise the vendors within the farmer's market (collectively, the "Vendors").[50]

The Vendors sold meat, seafood, deli items, and/or similar grocery items.[51] Most of these grocery items are explicitly prohibited by the Lease.[52]  Moreover, the Vendors collectively comprise a grocery store, located mere feet from Redner's.[53]

On October 7, 2011, Gary O'Brien, Redner's Vice President of Perishable Retail Operations, catalogued food products sold at Lapp's, Beiler's BBQ, and All Fresh.[54]  Lapp's and Beiler's BBQ sold 37 products identical to those sold by

---

[47]See J.A. Vol. VI, p. 2458.
[48]See J.A. Vol. VIII, Plaintiff's Exhibit 1, p. 3308; J.A. Vol. VIII, Plaintiff's Exhibit 14(A-B), pp. 3320-3321; J.A. Vol. VI, p. 2458.
[49]See J.A. Vol. IV, pp. 1300-1316.
[50]See id., pp. 1300-1302; J.A. Vol. III, pp. 934-940.
[51]See J.A. Vol. VIII, Plaintiff's Exhibit 25, pp. 3322-3351; J.A. Vol. XII, Plaintiff's Exhibit 26; J.A. Vol. IV, pp. 1303-1316; J.A. Vol. III, pp. 934-940, 1006-1014, 1026-1033, 1056-1060, 1065-1067.
[52]See J.A. Vol. X, Joint Exhibit 12, p. 3938-3940.
[53]See J.A. Vol. VIII, Plaintiff's Exhibit 25, pp. 3322-3351; J.A. Vol. XII, Plaintiff's Exhibit 26; J.A. Vol. IV, pp. 1303-1316; J.A. Vol. III, pp. 934-940, 1006-1014, 1026-1033, 1056-1060, 1065-1067.
[54]See J.A. Vol. VIII, Plaintiff's Exhibit 25, pp. 3322-3351.

12

Redner's for approximately the same prices.[55]  All Fresh sold 59 products identical to those sold by Redner's for approximately the same prices.[56]  Beiler's BBQ sold 10 fresh poultry products identical to those sold by Redner's for approximately the same prices.[57]

## I.    The Vendors Chose Not To Join In This Litigation.

JTF knew of the Restrictive Use Covenant before the Vendors opened for business in the Shopping Center.[58]  In fact, on October 15, 2009, JTF required Joppatowne to represent, defend, and indemnify JTF if JTF was sued by Redner's for opening the farmer's market (the "JTF Agreement").[59]  Moreover, Brian Miller, owner of JTF, testified that he was concerned about the Restrictive Use Covenant when he signed JTF's lease with Joppatowne.[60]

In the JTF Agreement, Joppatowne promised to "vigorously assert the general proposition agreed to by the parties herein [that the farmer's market would not violate the Restrictive Use Covenant]."[61]  Joppatowne further promised to indemnify JTF and pay its legal fees if it were sued because of the farmer's

---

[55] See J.A. Vol. VIII, Plaintiff's Exhibit 25, pp. 3322-3351.
[56] See id., Plaintiff's Exhibit 25, pp. 3322-3351.
[57] See J id., Plaintiff's Exhibit 25, pp. 3322-3351.
[58] See J.A. Vol. X, Joint Exhibit 18, pp. 3998-4002.
[59] See id., Joint Exhibit 18, pp. 3998-4002.
[60] See J.A. Vol. III, pp. 1060-1063.
[61] See J.A. Vol. X, Joint Exhibit 18, pp. 3998-4002.

13

market.[62] JTF and Joppatowne obviously contemplated the likelihood that the

farmer's market would violate the Restrictive Use Covenant, entered into the JTF

Agreement, and agreed that Joppatowne would exclusively represent the common

interests of JTF and the Vendors in any resulting litigation.[63]

Likewise, the Vendors have known of this litigation, and Redner's requested

relief, since at least October, 2011, when they were deposed.[64] Additionally, at

least four Vendors testified at trial beginning in December of 2011 (John Walters,

owner of All Fresh; Reuben King, owner of King's Deli Cheese & Meats; Elmer

Lapp, owner of Lapp's; and Menno Beiler, owner of Beiler's Baked Goods).[65]

Despite knowing of this litigation and the relief sought by Redner's, the Vendors

elected not to intervene.[66]

## J.   **Redner's Damages**

Over the Lease term, Redner's will suffer approximately $2.2 million in lost

profits due to the Vendors.[67] Redner's economic expert, Edward A. Suarez,

reviewed Redner's financial data and determined that Redner's has experienced a

decline in sales growth attributable to the destructive competition from the

---

[62]See J.A. Vol. X, Joint Exhibit 18, pp. 3998-4002.
[63]See id.
[64]See Plaintiff's Exhibit 18(a-j).
[65]See J.A. Vol. III, pp. 936-968, 1006-1099; J.A. Vol. IV, pp. 1291-1358.
[66]See J.A. Vol. I, pp. 1-21.
[67]See J.A. Vol. VIII, Plaintiff's Exhibit 39, pp. 3388-3450.

14

Vendors.[68]  This decreased growth trend has resulted in significant damages to date and, over the course of the Lease term, will amount to over $2.2 million in lost profits.[69]

---

[68]See J.A. Vol. VIII, Plaintiff's Exhibit 39, pp. 3388-3450.
[69]See id.

15

# SUMMARY OF ARGUMENT

## Redner's Arguments On Appeal

Redner's respectfully submits that the District Court committed errors of law and/or abused its discretion as follows:

1.    The District Court erred by finding that Redner's waived its right to damages because it precluded Redner's from offering damages evidence at trial, promising instead to consider it at a later hearing.

2.    The District Court erred in finding that the definition of "in-store-sales-area," as used in the Restrictive Use Covenant, did not include all in-store areas used for the sale of merchandise because this finding is contrary to the plain language of the Lease and renders the Restrictive Use Covenant largely meaningless.

3.    The District Court erred in finding that the area around the "island display" in Beiler's Baked Goods was included within its "gross floor area" because it was common space for which rent was paid by all Vendors, not just Beiler's Baked Goods.

4.    The District Court erred in finding that Beiler's BBQ is not a "butcher shop" because Beiler's BBQ cuts and sells fresh raw meat.

5.    The District Court applied an incorrect legal standard in denying Redner's lost profit damages because Redner's was not required to prove the

16

percentage of its lost profits attributable to Joppatowne or to introduce evidence of the Vendors' sales to recover lost profits.

**Response To Joppatowne's Arguments On Appeal**

1. The District Court properly held that the Vendors are not indispensable parties because they are not persons to be joined if feasible under Rule 19, and, in any event, the Vendors' interests are adequately protected. Moreover, Joppatowne waived this argument.

2. The District Court properly held that Redner's is not obligated to pay percentage rent on gas sales because the parties agreed that the Lease Amendment would include "no additional rental costs."

3. The District Court properly interpreted the meaning of "butcher shop" and "seafood shop" in the Lease as the terms applied to Lapp's and All Fresh, respectively.

4. The District Court properly entered the permanent injunction, and Redner's was not required to prove irreparable harm.

17

## ARGUMENT

### I.     STANDARD OF REVIEW

The Court applies a mixed standard of review to appeals of a trial court's findings of fact and conclusions of law entered after a bench trial.  See Williams v. Sandman, 187 F.3d 379 (4th Cir. 1999) (citing case law and Fed. R. Civ. P. 52(a)).  The Court reviews the granting or denial of a permanent injunction for abuse of discretion.  Lone Star Steakhouse & Saloon, Inc. v. Alpha of Virginia, Inc., 43 F.3d 922, 940 (4th Cir. 1995) (affirming grant of injunctive relief).  The Court applies de novo review to a trial court's conclusions of law and reverses the trial court's findings of fact only if "clearly erroneous."  Id.; Fed. R. Civ. P. 52(a).

### II.     REDNER'S ARGUMENTS IN SUPPORT OF ITS APPEAL

#### A.     The District Court Erred By Precluding Redner's From Offering Damage Evidence Other Than Lost Profits.

The District Court wrongly precluded Redner's from offering any damage evidence other than lost profits.  Evidence of diminution in value of a leasehold interest, not lost profits' evidence, is often the best evidence of damage resulting from the breach of a restrictive use covenant in a commercial lease.  See, e.g., Fontainbleau Hotel Corp. v. Crossman, 323 F.2d 937, 944 (5th Cir. 1963) (holding that the jury properly considered evidence of diminution in lease value, in part, because there was no certain measure of lost profits).  Nevertheless, the District

18

Court ordered Redner's to present only "traditional" lost profits' damage evidence at trial, stating that it would consider other damage evidence at a later hearing.[70] The District Court then compounded its error by later concluding that Redner's could not present its damage evidence because the District Court found that Redner's did not prove lost profits with certainty.

> **1.     Evidence of diminution in value of a leasehold interest is appropriate to remedy the breach of a restrictive use covenant.**

Evidence of diminution in value of a leasehold interest is typically allowed, and often required, to remedy the breach of a restrictive use covenant in a commercial lease.  See, e.g., Fontainbleau, 323 F.2d at 944; see also Herman Miller, Inc. v. Thom Rock Realty Co., 46 F.3d 183, 189 (2d Cir. 1995) (reversing district court and ordering that diminution of value in commercial lease was the proper form of damages to remedy breach of a restrictive use covenant); Arista Cards At Maspeth, Inc., v. FC Grand Ave. Assoc., 757 N.Y.S.2d 758, 760 (N.Y. App. Div. 2003) (affirming trial court's denial of summary judgment and allowing plaintiff to present evidence of diminution in value of a leasehold interest when it could not establish lost profits); Barr and Sons, Inc. of Cherry Hill, N.J. v. Cherry Hill Center, Inc., 217 A.2d 631, 642 (N.J. Super. Ct. App. Div. 1966) (reversing

---

[70]See J.A. Vol. I, Document No. 42, pp. 206-207; J.A. Vol. VI, Document No. 155, pp. 2670-2671; J.A. Vol. VII, Document No. 179, p. 3209, N.3.

ACTIVE 24612840v1 01/29/2014

trial court and remanding for additional damages evidence, including diminution of lease value due to violation of restrictive use covenant); Ripley Manu. Corp. v. Roosevelt Field, Inc., 238 N.Y.S.2d 133, 135 (N.Y. App. Div. 1963) (reversing trial court and remanding to allow plaintiff to present evidence of diminution of lease value despite lack of evidence of lost profits).

In Fontainbleau, the Fifth Circuit held that the jury properly considered evidence of diminution of lease value to remedy defendant's breach of a restrictive use covenant.  323 F.2d at 944.  Plaintiff, the owner and lessee of a retail store in a hotel, sued lessor and another tenant for violating an "exclusive" restrictive-use covenant giving plaintiff the exclusive right to sell certain goods.  Id. at 939.  The court found that "[o]n the issues of diminution of rental value, the experts who testified were found by the judge to be qualified in the field of leasing and gave the jury the full benefit of the method they used to calculate the damage done."  Id. at 944.

Similarly, in Herman Miller, the Second Circuit remanded a case for consideration of plaintiff's evidence of diminution of lease value caused by a landlord's breach of a use restriction in the lease.  46 F.3d at 189.  Plaintiff, a retail tenant, sued its landlord to enforce a use restriction that required the landlord to develop the building housing the leased premises into a showroom and design center.  Id. at 186.  Defendant failed to develop the building as promised, and

20

plaintiff sued.  Id.  The district court found that defendant breached the lease, but "ignored" plaintiff's evidence of the decreased value of its leasehold interest.  Id. On appeal, the court held that evidence of the decrease in value of plaintiff's leasehold interest was the proper method for calculating plaintiff's damages.  Id. at 189.

Likewise, courts within the Fourth Circuit have used the decrease in value of a leasehold interest to measure damage suffered by the possessor of property.  See, e.g., Nenr Investments, LLC v. Starbucks Corp., No. 1:08cv00047, 2009 WL 1404732, *10 (W.D. Va. May 18, 2009) (granting partial summary judgment and finding that damages for breach of lease included the loss in value of the leased premises); see also Genesco Inc. v. Monumental Life Ins. Co., 577 F. Supp. 72, 87 (D.S.C. 1983) (owner of partial interest in real property was entitled to recover damages equal to decrease in market value).

Here, as in Fountainbleau and Herman Miller, the diminution of value of Redner's leasehold interest is the best evidence of Redner's damages.

Redner's will pay $12,000,000.00 to Joppatowne under the Lease.[71]  It agreed to pay this substantial sum largely because of the Restrictive Use

---

[71]See J.A. Vol. X, Joint Exhibit 12, pp. 3913-3916.

21

Covenant.[72]  Redner's has not received the benefit of its bargain and is entitled to recover damages for the difference between what it contracted to receive and what it actually received.  See Fontainbleau 323 F.2d at 944.

As set forth below, the Court ordered Redner's **not to present evidence** of the decrease in value of its leasehold interest, and promised Redner's the opportunity to do so at a later date.[73]  Redner's followed and relied on the District Court's directives to its detriment, and presented lost profits evidence alone, despite the inherent difficulty of proving such damages.  See, e.g., Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 553 (4th Cir. 1994) (holding that proof of actual lost profits was impossible to calculate due to the difference between pricing and services offered to various tenants).

Specifically, in multiple informal telephone conferences, and in at least two formal Orders, the District Court ordered Redner's to present only evidence of lost profits damages.[74]  If Joppatowne violated the Restrictive Use Covenant, the District Court held, Redner's could then present its damages evidence.[75]  The

---

[72]See J.A. Vol. X, Joint Exhibit 12, pp. 3938-3940.
[73]See J.A. Vol. I, Document No. 42, pp. 206-207; J.A. Vol. VI, Document No. 155, pp. 2670-2671; J.A. Vol. VII, Document No. 179, p. 3209, N.3.
[74]See J.A. Vol. I, Document No. 42, pp. 206-207; J.A. Vol. VI, Document No. 155, pp. 2670-2671; J.A. Vol. VII, Document No. 179, p. 3209, N.3.
[75]See J.A. Vol. I, Document No. 42, pp. 206-207; J.A. Vol. VI, Document No. 155, pp. 2670-2671; J.A. Vol. VII, Document No. 179, p. 3209, N.3.

ACTIVE 24612840v1 01/29/2014

District Court reneged on this promise, denying Redner's the opportunity to present evidence of its damages.[76]  See Fontainbleau, 323 F.2d at 944; Herman Miller, 46 F.3d at 189.

> **2.    The District Court improperly concluded that Redner's was not entitled to present additional damages evidence because Redner's did not establish lost profits.**

In the July 11, 2013 Opinion, the District Court denied Redner's request to present additional damages evidence without explanation in a footnote:

> As Judge Legg noted in Letter Orders during earlier stages of the case, there was some suggestion that a second stage of litigation, relating to "more esoteric damage theories (e.g., diminution of value; constructive trust)" might come into play, depending on the outcome of the bench trial on liability and traditional damages theories.  Sept. 30, 2011 Letter Order, ECF No. 42.  In light of this Court's conclusion that Redner's has made no proof of monetary damages for lost profits caused by Joppatowne, as well as this Court's Order of Permanent Injunction (ECF No. 159) as to the two stalls found to infringe the restrictive use covenant, the issues of esoteric damage theories no longer have any bearing in this action.  Accordingly, no trial will be held on those matters.[77]

The District Court's finding that Redner's could not present additional damages evidence appears founded on the assumption that Redner's must show

---

[76]The damages theories proposed by Redner's include:  (1) decrease in the value of Redner's leasehold interest; and (2) imposition of a constructive trust on Joppatowne's ill-gotten gains.  See J.A. Vol. I, Document No. 36, pp. 118-126.
[77]See J.A. Vol. VII, Document No. 179, p. 3209, N.3.

ACTIVE 24612840v1 01/29/2014

lost profits caused by the Vendors before it can show alternative measures of damages.[78]  However, as the District Court implied in the July 11, 2013 Opinion and as federal courts have recognized, evidence of lost profits is difficult, if not impossible, to prove in circumstances such as those in the case at bar.  See Multi-Channel TV, 22 F.3d at 553.  It is for this reason that courts often award damages based on the diminution of value in a leasehold interest.  See Fontainbleau, 323 F.2d at 944; Herman Miller, 46 F.3d at 189.  It is also for this reason that Redner's amended its Complaint in September of 2011 to seek a constructive trust and/or diminution in value of its leasehold interest.[79]  Consequently, Redner's respectfully submits that the Court should reverse the District Court and grant a new trial to allow Redner's to present additional damages evidence in accordance with the District Court's prior Orders.

**B.    The District Court Erred By Not Defining "In-Store Sales Area" To Include All In-Store Areas Used For The Sale Of Merchandise.**

The District Court should have interpreted "in-store sales area," as used in the Restrictive Use Covenant, to mean all in-store areas used for the sale of merchandise, rather than product display areas exclusively.  The District Court's construction of the phrase was not intended by the parties because, as illustrated by

---

[78]See J.A. Vol. VII, Document No. 179, p. 3209, N.3.
[79]See J.A. Vol. I, Document No. 36, pp. 118-126.

24

the result in this case, any vendor can avoid the Restrictive Use Covenant by merely using smaller, denser, or more vertical display cases, which is an absurd result.

### 1. The narrow definition of "in-store sales area" applied by the District Court renders the Restrictive Use Covenant meaningless.

The District Court's definition of "in-store sales area" renders a large portion of the Restrictive Use Covenant meaningless. For this reason alone, the District Court's construction should be rejected.

Contracts must be interpreted to give the intended meaning to every term. See Keffer v. H.K. Porter Co., Inc., 872 F.2d 60, 62 (4th Cir. 1989) (recognizing that "as with any contract interpretation, we begin by looking at the language of the agreement for any clear manifestation of the parties' intent"); Quorum Health Resources, LLC v. Hugh Chatham Memorial Hosp., Inc., 552 F. Supp. 2d 527, 533 (M.D. N.C. 2007) (construing contractual terms so as to give meaning to every term and holding that "the object of construction is to ascertain the intent of the parties"); Restatement (Second) of Contracts § 203(a) ("an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect").

In General Drivers, Warehousemen and Helpers Local Union No. 509 v. Ethyl Corp., 68 F.3d 80 (4th Cir. 1995), the Fourth Circuit affirmed the trial court's

25

finding that an arbitration clause in a contract did not apply to a dispute. Id., at 85. Plaintiff argued that the claims were subject to arbitration despite the applicability of an exemption in the contract. Id. The trial court disagreed. Id. On appeal, the Fourth Circuit agreed with the trial court that, if plaintiff's interpretation applied, it would render the arbitration exemptions meaningless, and, therefore, affirmed the trial court's grant of summary judgment. Id.

Here, the eight Vendors, the parties, and the District Court agreed that, given the District Court's definition of "in-store sales area," none of the Vendors violated the 25% restriction, with the possible exception of Beiler's Baked Goods.[80] This highlights the fact that the Restrictive Use Covenant's 25% "in-store sales area" restriction has no practical meaning when given the definition applied by the District Court because none of the Vendors, several of which are (or were) selling a high volume of grocery products prohibited by the Restrictive Use Covenant, are prohibited based on the District Court's interpretation.

Moreover, it is difficult to conceive of any grocery retailer where "display areas" exceed 25% of the gross floor area. Such a retailer would, by necessity, have insufficient space for customers to browse, for inventory storage, or for employees to work. It is highly unlikely that two parties experienced in grocery

---

[80]See J.A. Vol. VII, Document No. 179, pp. 3212-3213.

ACTIVE 24612840v1 01/29/2014

store leases and restrictive use covenants, who were engaged in negotiations, would have included in the Lease language that has no practical purpose.  See, e.g., Lawler v. Schumacher Filters America, Inc., 832 F. Supp. 1044, 1053-1054 (E.D. Va. 1993) (recognizing that sophisticated parties to a negotiated contract are presumed to have intended the language in a contract to have meaning); see also Paper Exp., Ltd. v. Pfankuch Maschinen GmbH, 972 F.2d 753, 759 (7th Cir. 1992) (holding that sophisticated contracting parties are presumed to have understood and intended the language of an agreement and are bound thereby).  Therefore, the District Court's narrow definition of "in-store sales area" should be rejected.

> **2.    The logical definition of "in-store sales area," intended by the parties, includes all in-store areas used for the sale of merchandise.**

The logical construction of "in-store sales area," as intended by the parties, is just what the Lease says - all in-store sales areas.  Logically, this construction must include all areas used for the sale of merchandise, including space for items being sold, merchandise creation and packaging, customer browsing, and merchandise display.  The District Court recognized the logic behind this reasoning, but inexplicably rejected it in favor of "Joppatowne's more restrictive interpretation."[81]  Though the District Court correctly recognized that the Lease did

---

[81]See J.A. Vol. VI, p. 2479.

27

not define the term "in-store-sales-area," this does not necessitate the application of an illogical definition. See Quorum Health, 552 F. Supp. 2d at 533; Keffer, 872 F.2d at 62.

Moreover, the District Court's primary stated reason for its construction is the use of the word "offer" in connection with "sale" in the pertinent Lease clause, but this usage demonstrates that Redner's proposed, more logical, definition applies.[82] Certainly, items are "offered" for sale from their display shelves, but they are also "offered" for sale from packaging counters, cash registers, customer waiting areas, and certainly from the areas behind the counters where employees physically "offer" products to customers.[83] Consequently, Redner's respectfully requests that the Court reverse the District Court and hold that "in-store sales area" includes all in-store areas used for the sale of merchandise.

### C. The Area Around The "Island" Display In Beiler's Baked Goods Should Be Excluded From Its "Gross Floor Area."

The area around the island display in Beiler's Baked Goods should have been excluded from its "Gross Floor Area" because it is "common space" for which rent is shared by the Vendors. Therefore, applying the District Court's definition, it cannot be included in "Gross Floor Area." In fact, Mr. Beiler, owner

---

[82]See J.A. Vol. VI, pp. 2479-2480.
[83]Black's Law Dictionary defines the word "offer" as "[t]he act or an instance of presenting something for acceptance." BLACK'S LAW DICTIONARY (8th Ed., 2004).

28

of Beiler's BBQ, testified that the area around the island display at Beiler's Baked Goods is a common area and that Beiler's Baked Goods pays rent for only 1,060 square feet, a number too small to include the area around the island display.

### 1. The District Court found that "Gross Floor Area" does not include any common areas.

In its January 24, 2013 Opinion, the District Court found that "Gross Floor Area" is calculated by considering "the area of the vendor's individual stall."[84] Each Vendor's "Gross Floor Area does not include any of the common areas."[85] The District Court found that "[t]he common space includes everything outside the perimeters of each stall, including the aisle space and the seating areas."[86]

The District Court found that including the common space in a Vendor's "Gross Floor Area" would inflate the "Gross Floor Area" and render meaningless the twenty-five percent restriction in the Lease: "[t]he floor space of each stall should not be artificially increased by adding common area square footage."[87] Applying this principle here shows that the "Gross Floor Area" of Beiler's Baked Goods could be no larger than 1,060 square feet, which is the maximum area for which Beiler's Baked Goods pays rent, as explained below.

_____

[84]See J.A. Vol. VI, p. 2479.
[85]See id.
[86]See id., p. 2459.
[87]See id., p. 2479 N.36.

29

### 2. Mr. Beiler testified that the area around Beiler's Baked Goods' island is a common area.

Mr. Beiler and Mr. King testified at trial about the Vendors' lease and admitted that the area around the Beiler's Baked Goods' island display is a common area, the cost for which was split between all of the Vendors.[88]  On cross examination, Mr. Beiler was presented with a color-coded diagram of the Vendors' stalls[89] and asked the location of the area for which Beiler's Baked Goods paid rent.[90]  Mr. Beiler agreed that it was the area enclosed in yellow highlighting, including the back office areas shown as white.[91]  Significantly, this area did **not** include the area around the island.[92]  Thus, Mr. Beiler himself admitted that the island was not a part of his stall's "Gross Floor Area."[93]

### 3. Mr. Beiler testified that Beiler's Baked Goods pays rent on only 1,060 square feet.

Mr. Beiler also admitted that Beiler's Baked Goods pays rent for only 1,060 square feet of space,[94] rather than the 1,116.75 square feet calculated by Defendant's expert, Shellie Curry, and adopted by the District Court in the July 11,

---

[88] See J.A. Vol. IV, pp. 1322-1324; J.A. Vol. III, p. 1031.
[89] See J.A. Vol. IX, Defendant's Exhibit 35(a), p. 3587.
[90] See J.A. Vol. IV, p. 1324; J.A. Vol. IX, Defendant's Exhibit 35(a), p. 3587.
[91] See id.
[92] See id.
[93] See id.
[94] See J.A. Vol. IV, p. 1323.

30

2013 Opinion.[95]  This 1,060 square foot figure is too small to include the area

around the island display, and some 56.75 square feet smaller than the District

Court's finding of 1,116.75.[96]  Consequently, because the probative evidence at

trial established that the area around Beiler's Baked Goods' island display was

"common area," it cannot be included in that stall's "Gross Floor Area," as defined

by the District Court.  Therefore, the District Court's finding on this issue is clearly

erroneous.

### D.    Beiler's BBQ Violates The Restrictive Use Covenant Because It Is A Butcher Shop.

Beiler's BBQ, like Lapp's, sells fresh and frozen raw meat, and is, therefore,

a "butcher shop."  Very little case law defines "butcher shop," but the case law and

dictionary definitions that exist show that the term broadly refers to stores that sell

raw meat.[97]  See Burber v. Jilamb Prime Meat, Inc., 455 N.Y.S.2d 44, 49 (N.Y. Ct.

Cl. 1982) (defining the term "butcher store" to refer to stores that sell meat and

related products).  The evidence in this case established that Beiler's BBQ sells

and cuts multiple kinds and cuts of fresh raw poultry, and Redner's raised, and

---

[95]See J.A. Vol. VII, p. 3219.

[96]See id.

[97]The District Court did not define "butcher shop."  With regard to Lapp's, which the District Court found to be an excluded "butcher shop" under the Lease, the District Court observed that it processed and sold fresh meats and was, by "any reasonable definition," a butcher shop.  See J.A. Vol. VI, p. 2485-2486.

31

never waived, this argument.[98]  Thus, Beiler's BBQ violates the Restrictive Use Covenant.

### 1.   The definition of "butcher shop" is broad and focuses on the sale of raw meat.

In one of the very few reported cases addressing the meaning of "butcher shop" in a commercial lease, another court adopted the following definition of "butcher store":

> In the absence of any specific reference or listing of food products in the lease of a butcher store use clause, "a butcher store" is defined as a place that sells at retail, meat, poultry and their by-products (milk, eggs, butter and lard), including all other items commonly, directly and closely associated with meat, and poultry, whether dry, packed, canned or frozen, i.e., seasonings, mustard, ketchup, horseradish, baked beans, sauerkraut, stuffings and coatings.

Burber, 455 N.Y.S.2d at 49.  Though not binding on this Court, the definition above further demonstrates that the term "butcher shop," as used in the Lease, is not limited exclusively to slaughterhouses, as Joppatowne apparently defines it.

Further, commonly used internet-based dictionaries similarly define "butcher" or "butcher shop" in broad terms:

- The Free Dictionary defines "butcher shop" as "a shop in which meat and poultry (and sometimes fish) are sold";[99] and

---

[98]See, e.g., J.A. Vol. VIII, Plaintiff's Exhibit 25, p. 3322-3351.

32

- Collins' English Dictionary defines "butcher's shop" as "a shop dedicated to the selling of meat."[100]

Each of these definitions focuses on the products sold, rather than whether animals are killed and processed, to define what is, and what is not, a "butcher shop." Also, the purpose of the Restrictive Use Covenant is to prevent destructive competition with Redner's.[101]  The Redner's butcher shop sells raw meat and poultry – it is not a slaughterhouse.[102]

## 2. Beiler's BBQ sells multiple kinds and cuts of fresh raw poultry, and, therefore, is a "butcher shop."

The District Court correctly found that Beiler's BBQ sells "various cuts of fresh, raw chicken, and prepared food,"[103] and that the stall contained a refrigerated case offering "fresh, uncooked chicken" for sale.[104]  However, the District Court incorrectly concluded that Beiler's BBQ is "not proscribed by section 13.01(a)(i) as a 'butcher shop.'"[105]

---

[99]The Free Dictionary – "butcher shop," http://www.thefreedictionary.com/butcher+shop.
[100]Collins English Dictionary – "butcher shop," http://www.collinsdictionary.com/dictionary/english/butcher-s-shop.
[101]See J.A. Vol. III, pp. 874-875.; J.A. Vol. X, Joint Exhibit 12, pp. 3934, 3938-3940.
[102]See J.A. Vol. VIII, Plaintiff's Exhibit 25, pp. 3322-3351.
[103]See J.A. Vol. VI, p. 2489.
[104]See id.
[105]See id.

33

Mr. Beiler testified that Beiler's BBQ sells, and sometimes cuts, multiple

kinds and cuts of fresh poultry:

> Q.  Describe for the Court, please, that operation.  What, how does Beiler BBQ operate, and what does it sell?
>
> A.  Well, if you look at the display there, going down through, first I have about a 12-foot case there where I sell various cuts of fresh chicken.[106]
>
> …
>
> Q.  Okay.  You're -
>
> A.  I'm a chicken man.[107]
>
> …
>
> Q. Do you cut and piece your chicken at your stand?
>
> A.  Usually not.
>
> Q.  Okay.  You buy it already cut?
>
> A.  Yes, sir.
>
> Q.  Are there times though that you piece the chicken?
>
> A.  Once somebody buys cold chicken, I'll cut it up sometimes.
>
> Q. And you offer that service?
>
> A.  Yes, sir.[108]

---

[106]See J.A. Vol. IV, p. 1309.
[107]See id., p. 1329.
[108]See id., p. 1336.

34

Gary O'Brien, Redner's Vice President of Perishable Retail Operations for Redner's, also testified regarding the products sold by Beiler's BBQ.[109] Redner's introduced Mr. O'Brien's chart comparing the products sold by the Vendors, including Beiler's BBQ, and those sold by Redner's.[110] In particular, Mr. O'Brien's chart shows that Beiler's BBQ sells ten distinct fresh poultry meat cuts virtually identical to Redner's butcher shop products in description and in price.[111]

Redner's also introduced through Mr. O'Brien three color photographs showing the fresh cut poultry products offered by Beiler's BBQ.[112] As shown in these photographs, Beiler's BBQ offers a number of fresh cut poultry products typical of a poultry butcher, including individually cut chicken wings, legs, breasts, and thighs, packaged wings, chicken livers by the pound, fresh stuffed chicken breasts, whole roasters, whole fryers, turkey legs, turkey wings, turkey necks, turkey breasts, whole fresh turkeys, turkey gimlets, and fresh ground turkey.[113]

Finally, Redner's introduced the health department records filed by Beiler's BBQ,[114] which demonstrate that Mr. Beiler represented to the health department

---

[109]See J.A. Vol. III, pp. 913-914.
[110]See J.A. Vol. VIII, Plaintiff's Exhibit 25, pp. 3322, 3324, 3349-3351.
[111]See id., pp. 3322, 3324.
[112]See id., pp. 3349-3351.
[113]See id.
[114]See Plaintiff's Exhibit 8, pp. RED00398 – RED00406.

35

his intent to sell raw seafood, raw beef, raw pork, raw ground beef, raw sausage, raw chicken, and raw turkey at Beiler's BBQ.[115]

The intent of the Restrictive Use Covenant was to prevent other businesses from destructively competing with Redner's for sales.[116]  Here, Beiler's BBQ competed directly with Redner's by selling a variety of fresh raw meat products, pre-cut and cut to customers' orders.[117]  Based on the definition of "butcher store" in Burber and the general usage of the terms "butcher" and "butcher shop" as shown by the referenced dictionaries, Beiler's BBQ is a "butcher shop" as the term is used in the Lease, and the District Court erred in finding to the contrary.

### 3. Redner's did not waive its claim that Beiler's BBQ violates the Restrictive Use Covenant because it is a butcher shop.

As the District Court correctly found in the July 11, 2013 Opinion, Redner's agreed that Beiler's BBQ (as well as King's Deli Meats and Cheese) did not violate the 25% restriction in the Restrictive Use Covenant based on the District Court's definition of the term "in-store sales area."[118]  Nevertheless, Redner's never abandoned its arguments that Beiler's BBQ is prohibited as a "butcher shop" and/or that the District Court's construction of "in-store sales area" was incorrect.

---

[115]See Plaintiff's Exhibit 8, pp. RED00398 – RED00406.
[116]See J.A. Vol. III, pp. 874-875.
[117]See J.A. Vol. VIII, Plaintiff's Exhibit 25, pp. 3322, 3324, 3349-3351.
[118]See J.A. Vol. VII, p. 3208, N.2.

36

To the contrary, Redner's listed Beiler's BBQ as a Vendor in violation of the Restrictive Use Covenant in each of its pre-trial submissions.[119]  In fact, Redner's even proposed as a pre-trial stipulation, which Joppatowne rejected, that "Beiler's BBQ sells fresh cut poultry."[120]  Moreover, Redner's introduced evidence that Beiler's BBQ violated the Restrictive Use Covenant as a "butcher shop" through, among other things, the testimony of Mr. Beiler and Mr. O'Brien and Plaintiff's Exhibit No. 25.[121]  Thus, Redner's did not waive its argument that Beiler's BBQ violates the Restrictive Use Covenant because it is a butcher shop, but raised it at each and every possible opportunity.[122]

### E.    Redner's Was Not Required To Prove The Percentage Of Its Lost Profits Attributable To Joppatowne Or To Introduce Evidence Of The Vendors' Sales To Recover Lost Profits.

The District Court applied an incorrect legal standard to Redner's request for lost profit damages.  Redner's was not required to prove the percentage of its lost profits attributable to Joppatowne or to introduce evidence of the Vendors' sales to

---

[119]See J.A. Vol. II, Document No. 49, p. 454 (proposing stipulations of fact that "Beiler's BBQ sells fresh cut poultry" and that "Beiler's BBQ and Lapp's Fresh Meats are 'butcher shops' for purposes of the Lease between the Parties"); J.A. Vol. VI, Document No. 143, pp. 2530, 2535; J.A. Vol. VII, Document No. 172, p. 2845.

[120]See J.A. Vol. II, Document No. 49, p. 454.

[121]See J.A. Vol. IV, pp. 1309, 1329, & 1336; J.A. Vol. VIII, Plaintiff's Exhibit 25, pp. 3322, 3324, 3349-3351

[122]See J.A. Vol. II, Document No. 49, p. 454; J.A. Vol. VI, Document No. 143, pp. 2530, 2535; J.A. Vol. VII, Document No. 172, p. 2845.

recover lost profits. See M & R Contractors & Builders, Inc. v. Michael, 138 A.2d 350, 355 (Md. 1958) (holding that, in awarding lost profits damages, "where a defendant's wrong has caused the difficulty of proving damage, he cannot complain of the resulting uncertainty"); see also David Sloane, Inc. v. Stanley G. House & Associates Inc., 532 A.2d 694 (Md. 1987) (recognizing that, to obtain lost profit damages, "mere difficulty in ascertaining the amount of damage is not fatal," and "mathematical precision in fixing the exact amount is not required"); Thomas v. Capital Medical Man. Assoc., LLC, 985 A.2d 51, 67-68 (Md. Ct. Spec. App. 2009) (holding that lost profits damages "can be ascertained by reference to some fairly definite standard, such as market value, established experience, **or direct inference from known circumstances"** (emphasis added)); Nat'l Micrographics Sys., Inc. v. OCE-Industries, Inc., 465 A.2d 862, 869-870 (Md. Ct. Spec. App. 1983) (holding that, "if the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference").

In Thomas, the appellate court affirmed the trial court's award of lost profits' damages based primarily on layperson testimony regarding an estimated collection rate for accounts receivable. 985 A.2d at 67-68. In affirming this award, the court recognized that the difficulty in ascertaining the amount of damages did not prevent an award of such damages. Id. To the contrary, lost profits can be awarded based on evidence that "lay[s] some foundation enabling

38

the fact finder to make a fair and reasonable estimate of the amount of the damage." Id. at 68.

In National Micrographics, the appellate court reversed the trial court's finding that plaintiff did not prove its lost profits with "reasonable certainty," holding that "proof of the sales made and business done in the agreed territory before the breach" was sufficient to award lost profits. 465 A.2d at 870. Defendant had agreed to allow plaintiff the exclusive right to sell its products within a certain geographical area. Id. at 866-867. Plaintiff discovered that defendant was selling its products to customers within plaintiff's exclusive region and sued to recover its lost profits. Id. Among other things, plaintiff presented evidence that defendant sold the same products at the same prices in the same area. Id. at 870. At trial, the jury found that defendant breached its contract, causing harm to plaintiff. Id. at 869. Nevertheless, the trial court precluded plaintiff from recovering its lost profits because of that plaintiff's failure (1) to introduce evidence of defendant's sales to plaintiff's actual customers, and/or (2) that such customers would have bought from plaintiff if not from defendant. Id.

The appellate court reversed, holding that evidence that plaintiff and defendant sold approximately the same goods for approximately the same prices, among other things, was sufficient to support an award of lost profits to plaintiff.

39

Id. at 870. Furthermore, the court held that defendant was estopped by its breach

from arguing that other factors may have caused plaintiff's lost profits:

> The law seeks to encourage reliable contracting by giving
> the non-breaching party the benefit of the bargain-placing
> it in the position it would have occupied had no breach
> occurred. The law also seeks to discourage breach of
> contract by seeing to it that a party does not benefit from
> its breach. In this case, [plaintiff] bargained for the right
> to occupy the field in a particular market. A jury could
> find that, had [defendant] complied with the contracts by
> referring customers, [plaintiff] would have made the
> sales, thus reaping the benefit of its bargain. **Because
> [defendant] sold directly to customers that it should
> have referred [to plaintiff], it is estopped by its
> wrongful conduct to deny that [plaintiff] would have
> made the sales**.

Id. at 870-871 (emphasis added).

Here, Redner's presented evidence of its sales in the fifty-two weeks

preceding the opening of the farmer's market.[123] Specifically, Mr. O'Brien

testified to Redner's average weekly sales and profit for the meat department and

seafood department.[124] Mr. O'Brien further testified to the reduced sales and

profits of those same departments since the Vendors opened on March 17,

2011.[125] Mr. O'Brien also testified that the Vendors sold the same products as

---

[123]See J.A. Vol. VII, pp. 2890-2915; J.A. Vol. VII, pp. 3219-3221.
[124]See J.A. Vol. VII, pp. 2890-2900, 2904-2908; J.A. Vol. VII, pp. 3219-3221.
[125]See J.A. Vol. VII, pp. 2890-2900, 2904-2908; J.A. Vol. VII, pp. 3219-3221.

40

Redner's at competitive prices.[126]  Joppatowne's only defense was that other
factors may have caused Redner's loss (i.e., that a competitor, Sav-A-Lot, opened
3.3 miles from Redner's Joppatowne location).[127]  Having breached the
Restrictive Use Covenant, however, Joppatowne cannot now argue that other
factors caused Redner's loss.  See M & R Contractors, 138 A.2d at 355.

If, as Joppatowne suggests, stores in the same geographic vicinity compete
and reduce each other's sales, then Joppatowne concedes that the Vendors compete
with, and reduce the sales and profits of, Redner's Joppatowne store.  Although the
proportionate impact of each competitor may be debatable, the fact that Redner's
was damaged is not.

Redner's was not required to show "mathematical precision," Thomas, 985
A.2d at 67-68, or to prove that Save-A-Lot was not a factor.  Indeed, Redner's was
required to show (1) a loss caused by Joppatowne's breach, (2) foreseeability of
the loss, and (3) reasonable certainty of lost profits.  See Impala Platinum Ltd. v.
Impala Sales (U.S.A.), Inc., 389 A.2d 887, 907 (Md. 1978).  Redner's did just this
and, in fact, produced the exact type of evidence as the plaintiff in National

---

[126]See J.A. Vol. VIII, Plaintiff's Exhibit 25, pp. 3322-3351.
[127]See J.A. Vol. IV, pp. 1450-1451; J.A. Vol. VII, pp. 3221-3223.

ACTIVE 24612840v1 01/29/2014

Micrographics.[128]  See 465 A.2d at 870.  Consequently, Redner's respectfully

requests that the Court reverse the District Court and direct it to award monetary

damages to Redner's or, if necessary, a new trial.

---

[128]See J.A. Vol. VII, pp. 2890-2900, 2904-2908; J.A. Vol. VII, pp. 3219-3221; J.A.
Vol. VIII, Plaintiff's Exhibit 39, pp. 3388-3450.

ACTIVE 24612840v1 01/29/2014

## III.   REDNER'S ARGUMENTS IN OPPOSITION TO JOPPATOWNE'S APPEALS

Joppatowne's appeals should be denied, and the District Court affirmed, as set forth in detail below.  First, the Vendors are not indispensable parties because they are not persons to be joined if feasible under Rule 19, and, in any event, the Vendors' interests are adequately protected.  Moreover, Joppatowne waived this argument by waiting until after the close of trial to raise it.

Second, Redner's is not obligated to pay percentage rent on gas sales because the parties intended the Lease Amendment to include "no additional rental costs."

Third, the District Court properly applied the definitions of "butcher shop" and "seafood shop" in the Lease as they applied to Lapp's and All Fresh, respectively.

Fourth, the District Court properly entered the permanent injunction, and Redner's was not required to prove irreparable harm.

### A.   The Vendors Are Not Indispensable Parties Because They Are Not Persons To Be Joined If Feasible And Their Interests Are Adequately Protected.

The Vendors are not indispensable parties because:  (1) they are not "persons to be joined if feasible" under Rule 19(a); (2) even if the Vendors are

43

"persons to be joined if feasible," the Vendors' interests, if any, are adequately

protected; and (3) Joppatowne waived this argument.

### 1. __Applicable Law__

Federal Rule of Civil Procedure 19 requires a two-step analysis to determine

whether a party is indispensable:

> First, the court must determine whether [the third party]
> is a 'person to be joined if feasible' under Rule 19(a).
> That is, the court must decide whether [the third party] is
> a 'necessary party.' If [the third party] is determined a
> necessary party, the court then proceeds to the second
> step in the analysis, which is contained in Rule 19(b).
> Under Rule 19(b) the court must decide whether in equity
> and good conscience the action should proceed among
> the parties before it, or alternatively whether the action
> should be dismissed. Dismissal of the action follows
> from a finding that [the third party] is an 'indispensable
> party.'

Ferrofluidics Corp. v. Advanced Vacuum Components, Inc., 789 F. Supp 1201,

1209 (D. N.H. 1992), *aff'd* 968 F.2d 1463 (1st Cir. 1992).

No prescribed method determines whether a party is indispensable beyond

the Rule 19 guidelines. See Provident Tradesmens Bank & Trust Co. v. Patterson,

390 U.S. 102, 119-120 (1968). Consequently, "the determination [of whether a

particular nonparty is indispensable to an action] is heavily influenced by the facts

and circumstances of each case." Confederated Tribes of Chehalis Indian

Reservation v. Lujan, 928 F.2d 1496, 1499 (9th Cir. 1991).

44

Under the first step of the Rule 19 analysis, a person should be joined if

feasible (i.e., determined to be a "necessary" party) under the following

circumstances:

> (A) in that person's absence, the court cannot
> accord complete relief among existing parties; or
>
> (B) that person claims an interest relating to the
> subject of the action and is so situated that
> disposing of the action in the person's absence
> may:
>
>> (i) as a practical matter impair or impede the
>> person's ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a
>> substantial risk of incurring double,
>> multiple, or otherwise inconsistent
>> obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  If the party to be joined does not fall within the scope of

Rule 19(a)(1), the analysis ends because the party is neither "necessary" nor

"indispensable."  Id.

If the party to be joined falls within the scope of Rule 19(a)(1) (i.e., is

"necessary"), the court then decides, under Rule 19(b), whether to dismiss the

action or continue the matter amongst the existing parties.  In so doing, the court

considers the following factors:

> (A) the extent to which a judgment rendered in the
> person's absence might prejudice that person or
> the existing parties;

45

> (B) the extent to which any prejudice could be lessened or avoided by:
>
>> (1) protective provisions in the judgment;
>>
>> (2) shaping the relief; or
>>
>> (3) other measures;
>
> (C) whether a judgment rendered in the person's absence would be adequate; and
>
> (D) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b). The Rule 19(b) analysis is commonly referred to as the "equity and good conscience test." Patterson, 390 U.S. at 120.

Courts construe Rule 19(b) liberally to avoid dismissing lawsuits because "[d]ismissal of a case [under Rule 19(b)] is a drastic remedy . . . which should be employed only sparingly." Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Rite Aid of South Carolina, Inc., 210 F.3d 246, 251 (4th Cir. 2000). "Courts are loath to dismiss cases based on nonjoinder of a party, so dismissal will be ordered only when the resulting defect cannot be remedied and prejudice or inefficiency will certainly result." Owens-Illinois, Inc. v. Meade, 186 F.3d 435, 442 (4th Cir. 1999).

### 2. The Vendors Are Not "Persons To Be Joined If Feasible" Under Rule 19(a)

The Vendors are not persons to be joined if feasible because, even if they have "an interest relating to the subject of the action," disposing of the action in the

46

Vendors' absence will not impair the Vendors' interests or leave them at risk of inconsistent obligations.  See Fed. R. Civ. P. 19(a)(1).

        **a.    The Vendors do not have "an interest relating to the subject of the action."**

The Vendors do not have "an interest relating to the subject of the action," as illustrated by the Vendors' deliberate choice not to intervene despite full knowledge of the lawsuit and the relief sought by Redner's.  In fact, as stated above, at least four Vendors testified at trial, as did the owner of JTF.[129]  Moreover, not only did JTF know of this litigation, but JTF actually anticipated that Redner's might sue to enforce the Restrictive Use Covenant.[130]  Consequently, JTF demanded the JTF Agreement, in which both JTF and Joppatowne acknowledged that Joppatowne alone would control any litigation regarding the Restrictive Use Covenant.[131]  If the Vendors decided not to join in this lawsuit in reliance upon the JTF Agreement, their interest must either be identical to Joppatowne's interest or non-existent.  See Patterson, 390 U.S. at 113.

---

[129]See J.A. Vol. III, pp. 936-968, 1006-1099; J.A. Vol. IV, pp. 1291-1358.
[130]See J.A. Vol. X, Joint Exhibit 18, pp. 3998-4002.
[131]See id.

47

### b. Resolving this action in the Vendors' absence will not impair their interests or leave them at risk of inconsistent obligations.

Even if the Vendors had "an interest relating to the subject of the action," their absence from this matter will not impair their interests or leave them at risk of inconsistent obligations. See Fed. R. Civ. P. 19(a)(1)(B)(i)-(ii); see also WMX Technologies, Inc. v. Jackson, 168 F.R.D. 64, 68 (M.D. Ala. 1996) (holding that third-party beneficiaries to a contract were not "necessary parties" under Rule 19(a) to a dispute between the parties to the contract where the third-party beneficiaries had no claim or obligation arising under the contract itself).

In Janney Montgomery Scott, Inc. v. Shepard Niles, Inc., 11 F.3d 399 (3d Cir. 1993), the court held that a co-obligor was not a "person to be joined if feasible" in a breach of contract action against another co-obligor because the failure to join the non-party would not impair its interests or leave it at risk of inconsistent obligations. Id. at 407-408. The court reached this decision despite the possibility that a judgment could have collateral estoppel effect against the non-joined party in a later proceeding. Id.

Here, the Vendors' absence will not impair their interests – in fact, the Vendors' decision not to join in this litigation despite their active involvement as witnesses compels the opposite conclusion. See Patterson, 390 U.S. at 113. Likewise, Redner's seeks no relief that will affect or modify the Vendors' rights in

48

any way. Redner's seeks damages from Joppatowne alone, a declaration of the parties' rights and obligations under the Lease, and injunctive relief against Joppatowne alone. Consequently, the Vendors retain all rights in their respective contracts, if any, with JTF and/or Joppatowne.

As stated above, the fact that Joppatowne was required to take action against the Vendors does not subject the Vendors to a risk of inconsistent obligations. See Janney, 11 F.3d at 408. To the contrary, Joppatowne has subjected itself to mutually exclusive contract obligations and must compensate any party, including Redner's or the Vendors, damaged as a consequence.

In any event, joinder is not feasible here because at least some of the Vendors are citizens of Pennsylvania.[132] See Patterson, 390 U.S. at 120. Because Plaintiff is also a citizen of Pennsylvania, joinder of the Vendors could impair the subject matter jurisdiction of the Court.

---

[132]See J.A. Vol. IV, pp. 1300-1316.

49

3. **Regardless Of Whether The Vendors Are "Persons To Be Joined If Feasible," This Action Should Continue In The Vendors' Absence Because The Vendors Are Not Indispensable Parties.**

Even if the Vendors are "persons to be joined if feasible" under Rule 19(a), the Vendors are not indispensable parties under the "equity and good conscience test" of Rule 19(b).

As the court held in Ferrofluidics, "[a third-party] has not become an indispensable party to this action simply because its rights and obligations under an entirely separate contract . . . may be affected by the results of the action." 789 F. Supp. at 1210; see generally, C. Wright & A. Miller, 7 Federal Practice & Procedure § 1613, at 197 (stating that "[w]hen a person is not a party to the contract in litigation and has no rights or obligations under that contract, **even though the absent party may be obligated to abide by the result of the pending action by another contract that is not at issue, the absentee will not be regarded as an indispensable party** in a suit to determine obligations under the disputed contract" (emphasis added)).

Here, the District Court properly found that the four factors in Rule 19(b) weighed in favor of continuing this action in the Vendor's absence. First, judgment rendered in the Vendors' absence did not prejudice the Vendors or the existing parties because the Vendors' interests were adequately represented and

50

protected. Second, any prejudice that existed was lessened or avoided by appropriately shaping the relief so that the judgment would not impair the Vendors' rights. Third, the judgment rendered in the Vendors' absence was adequate. Fourth, Redner's has no adequate remedy if this matter is dismissed for nonjoinder because Redner's would be forced to file suit in state court in Maryland and re-litigate all issues despite spending years and significant effort and money litigating this matter.

> ### a. The judgment rendered in the Vendors' absence did not prejudice the Vendors or the existing parties (Rule 19(b)(1)).

The judgment rendered in the Vendors' absence did not prejudice the Vendors or the existing parties because the Vendors' interests have been adequately represented and protected and Redner's requested relief was properly granted in their absence.

Third parties, even if beneficiaries to or of a contract, are not indispensable parties to a dispute between parties to the contract concerning a restrictive covenant in the contract. Ferrofluidics, 789 F. Supp at 1203-1207. In Ferrofluidics, a plaintiff sought a declaration that a restrictive covenant was enforceable. 789 F. Supp. at 1203-1207. Defendant filed a motion to dismiss for failure to join an alleged indispensable party, a third-party beneficiary to the contract, arguing that enforcing the restrictive covenant would cause the third party

51

significant harm.  Id.  The court denied the Rule 19 motion to dismiss, recognizing that "obviously none of [the third party's] rights or obligations will be ultimately determined" in the lawsuit.  Id. at 1208-1209.

Likewise, in Patterson, the Supreme Court held that an alleged tortfeasor could not join in a declaratory judgment action between his insurer and alleged victim.  390 U.S. at 119.  The Supreme Court found that the third party was not "indispensable," in part, because the third party "showed no interest in joinder until the Court of Appeals took the matter into its own hands."  390 U.S. at 113.

Here, just as in Ferrofluidics, judgment rendered in the Vendors' absence did not prejudice them because their rights and obligations with respect to JTF, Joppatowne, and Redner's, were not determined or affected in any way by the District Court's judgment.[133]  To the contrary, Redner's sought a declaration that **Joppatowne** breached the Lease and an order directing **Joppatowne** to comply with the Lease.  The District Court granted this request, and did not in any way impair the Vendors' rights against either Joppatowne or JTF, if any.[134]

Moreover, like the third party in Patterson, the Vendors showed no interest in joining in this action, either prior to or following these proceedings, despite testifying at depositions and at trial.  This is because Joppatowne agreed in writing

---

[133]See J.A. Vol. VI, pp. 2683-2696.
[134]See id.

52

to vigorously defend the "general proposition" collectively held by Joppatowne, JTF, and the Vendors.[135]

### b.    Any prejudice was avoided by shaping the relief appropriately (Rule 19(b)(2)).

The District Court avoided any prejudice that might have existed by shaping the relief to impact Joppatowne and Redner's only.[136]  Specifically, the Court found that Joppatowne violated the Restrictive Use Covenant and required Joppatowne to enforce the Restrictive Use Covenant without making any findings regarding the rights or obligations of JTF or the Vendors.[137]

Because dismissal of an action under Rule 19 is disfavored, Owens-Illinois, 186 F.3d at 442, courts should shape relief where necessary to avoid dismissal. Patterson, 390 U.S. at 113.

In McGovern v. Deutsche Post Global Mail, Ltd., No. Civ. JFM-04-0060, 2004 WL 912843, *7 (D. Md. 2004), the district court denied a Rule 19 motion to dismiss, finding that a non-party was not indispensable when the relief could be shaped appropriately.  Id.  In that declaratory judgment action, plaintiffs sought to have portions of a restrictive employment covenant declared unenforceable. Defendant, plaintiffs' former employer, moved to dismiss the action for failure to

---

[135] See J.A. Vol. X, Joint Exhibit 18, pp. 3998-4002.
[136] See J.A. Vol. VI, pp. 2683-2696.
[137] See id.

53

join plaintiffs' new competing company as a party.  Id.  The court entered a ruling

narrowly tailored to the contract provisions at issue, thereby protecting the non-

parties from any prejudice.  Id.

Here, the Court properly granted injunctive relief without making any

determination as to the rights and obligations of JTF or the Vendors.[138]  Indeed,

Redner's did not request any such determination.

### c. The judgment rendered in the Vendors' absence was adequate (Rule 19(b)(3)).

The District Court's judgment was adequate.  Though the judgment may not

be enforceable against non-parties (it can, however, collaterally estop Joppatowne

in a later action), the District Court properly decided the parties' rights and

obligations under the Lease, awarded (nominal) damages, and awarded permanent

injunctive relief to Redner's.[139]  See  Patterson, 390 U.S. at 111 (holding that "a

judgment is not res judicata as to, or legally enforceable against, a nonparty.  **It

obviously does not mean either . . . that a court may never issue a judgment

that, in practice, affects a nonparty**.").

Likewise, in Pa. Nat'l Mut. Cas. Ins. Co. v. Perlberg, 268 F.R.D. 218 (D.

Md. 2010), the district court that a potential beneficiary to an insurance contract

---

[138]See J.A. Vol. VI, pp. 2683-2696.
[139]See id.

54

was not an indispensable party to a declaratory judgment action regarding that contract. Id. at 221. The potential beneficiary argued that its rights would be affected by the outcome of the declaratory judgment action between the insurer and the insured. Id. The court held that the potential beneficiary was not an indispensable party, in significant part, because the existing parties' rights and obligations could be determined without joinder of the third party. Id. The fact that the third-party, as a potential beneficiary, had an interest in the outcome did not make it an indispensable party. Id. at 225.

Courts have found that a judgment will be inadequate under Rule 19(b)(3) primarily only when duplicative judgments are likely to occur. See, e.g., Owens-Illinois, 186 F.3d at 442. In Owens, for example, the court found that several third parties were indispensable specifically because a later lawsuit brought by them would concern the same contractual provisions and the same legal issues as those present in Owens. Id. Due to this risk of duplicative litigation and potentially inconsistent judgments, the court found those parties indispensable and dismissed the lawsuit. Id.

Here, the District Court determined the obligations of Joppatowne under the Lease.[140] There will not be duplicative judgments. Any lawsuits between

---

[140]See J.A. Vol. VI, pp. 2683-2696.

ACTIVE 24612840v1 01/29/2014

Joppatowne, JTF, and/or the Vendors will necessarily involve different contracts, rights, and legal arguments. Consequently, complete relief can be, and was, afforded in the Vendors' absence. Thus, the Vendors are not indispensable, and the District Court's conclusions of law should be affirmed on this issue.

> **d.**   **Redner's will not have an adequate remedy if this matter is dismissed for nonjoinder (Rule 19(b)(4)).**

Redner's will not have an adequate remedy if this matter is dismissed for nonjoinder because Redner's would be forced to file suit in state court in Maryland and re-litigate all issues despite the urgent nature of Redner's request that Joppatowne enforce the Restrictive Use Covenant and protect Redner's from destructive competition.

The United States Supreme Court held in <u>Patterson</u> that the remedy of a new trial is rarely "adequate" under Rule 19(b)(4) after trial is already complete. "After trial, however, the 'adequacy' of this hypothetical alternative [of a new trial in state court], from the plaintiffs' point of view, was obviously greatly diminished. Their interest in preserving a fully litigated judgment should be overborne only by rather greater opposing considerations than would be required at an earlier stage when the plaintiffs' only concern was for a federal rather than a state forum." 390 U.S. at 113.

ACTIVE 24612840v1 01/29/2014

In this case, having spent nearly three years in litigation, Redner's cannot be said to have an "adequate remedy" merely because it could potentially re-file this matter in state court.  Id.  Moreover, if Joppatowne's arguments are taken to their logical conclusion, Redner's could be required to join the fifty or more other flea market vendors, each of which leases space from JTF, and, according to JTF, might voluntarily cease operations if the Vendors closed.[141]  Redner's respectfully submits that it satisfied Rule 19 when Redner's sued the only other party to the Restrictive Use Covenant - Joppatowne.

### 4.    Joppatowne Waived Its Indispensable Party Argument.

Regardless of the outcome of the Rule 19 analysis above, Joppatowne waived this argument by waiting until after a lengthy trial and fifteen months of litigation to raise the issue.

Although a motion under Rule 12(h) for failure to join an indispensable party may be made at any time, a party may not wait until the close of trial to raise issues known about long before trial to protect its own interests.  The commentary to Rule 19 states:

> [W]hen the moving party is seeking dismissal in order to protect himself against a later suit by the absent person, and is not seeking vicariously to protect the absent person against a prejudicial judgment, **his undue delay in**

---

[141]See J.A. Vol. III, p. 1090.

57

> **making the motion can properly be counted against him as a reason for denying the motion**.

Fed. R. Civ. P. 19, advisory committee notes (emphasis added).  Courts of multiple jurisdictions have applied this principle to deny Rule 12(h) motions where the moving party delayed filing a Rule 19 motion.  E.g., Principal Life Ins. Co. v. DeRose, No. 1:08-CV-2294, 2012 WL 1642606, *8 (M.D. Pa. May 10, 2012).

In DeRose, the district court held that a party could not wait several months to file a Rule 12(h) motion intended to protect the moving party.  DeRose, 2012 WL 1642606 at *8.  "Fed. R. Civ. P. 12(h) cannot be interpreted to mean that a party with the necessary information to make a motion for joinder of an indispensable party at his disposal can sit back and raise it at any point in the proceedings, when the only effect of the motion under the circumstances would be to protect himself and not the person alleged to be indispensable."  DeRose, 2012 WL 1642606 at *8 (citing Benger Labs., Ltd. v. R.K. Laros Co., 24 F.R.D. 450, 452 (E.D. Pa. 1959)).[142]

---

[142]A late request to dismiss on jurisdictional grounds known to the moving party for years also violates federal court policy favoring judicial economy.  As the United States Supreme Court reasoned in Caterpillar Inc. v. Lewis, 519 U.S. 61, 75 (1996), "[o]nce a diversity case has been tried in federal court . . . considerations of finality, efficiency, and economy become overwhelming."  Id. at 75 (1996).  Further, "[r]equiring dismissal after years of litigation would impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention."  Newman-Green, Inc. v. Alfonzo-Larrain, 490 U.S. 826, 836 (1989).

58

ACTIVE 24612840v1 01/29/2014

Here, Joppatowne waited until fifteen months into this litigation, after a lengthy trial concluded, to claim that JTF and the Vendors were indispensable parties.[143]  Joppatowne should not be permitted to raise this argument merely to avoid a judgment at such a late stage in this litigation, and Joppatowne's "undue delay in making the motion can properly be counted against [it] as a reason for denying the motion."  See Fed. R. Civ. P. 19, advisory committee note; see also DeRose, 2012 WL 1642606 at *8; Sananap, 2011 WL 6130611 at *9.  Further, in addition to the manifest prejudice sustained by Redner's if it were required to re-litigate, the courts would be taxed with unnecessary duplicative litigation that would "impose unnecessary and wasteful burdens on the parties, judges, and other litigants waiting for judicial attention."  See Caterpillar, 519 U.S. at 75; see also Newman-Green, 490 U.S. at 836.

## B.    Redner's Is Not Obligated To Pay Rent On Gas Sales.

The District Court properly found that Joppatowne and Redner's clearly agreed that Redner's would operate the gas station at "no additional rental costs."[144]  First, the parties acknowledged this in three separate writings.  Second, the parties incorporated the Letter Agreement, stating that Redner's would pay "no

---

[143]See J.A. Vol. V, pp. 2232-2250.
[144]See J.A. Vol. VI, pp. 2470-2471; J.A. Vol. X, Joint Exhibit 13, pp. 3973-3974; J.A. Vol. V, pp. 2071-2072.

59

additional rental costs" for the gas station, into the Lease Amendment.  Third, the

Lease Amendment and Lease require Redner's to pay percentage rent only for the

"Demised Premises," which does not include the gas station.  Fourth,

Joppatowne's own counsel acknowledged early in this lawsuit that Redner's owed

no rent to Joppatowne for the gas station.  Consequently, although Joppatowne

devotes nine pages of its appellate brief to attempting to explain how "no

additional rental costs" actually means "additional rental costs," the language is

unambiguous and its plain meaning should be given effect.

> **1.    The parties acknowledged that Redner's owed no rent for the gas station in three separate writings.**

The parties agreed in three separate writings that Redner's would not pay

any rent for the gas station:

1.  On March 6, 2006, Mr. Fowler wrote to Carlton Smith, the real estate

    broker for both parties, and stated that "**Landlord is not asking for**

    **anything in return for allowing the gas pumps** other than

    assurances that such gas pumps will not adversely affect Landlord."[145]

2.  On March 10, 2006, in the Letter Agreement, Joppatowne's counsel

    agreed in writing that Redner's would pay "**no additional rental**

---

[145]See J.A. Vol. VIII, Plaintiff's Exhibit 45, pp. 3473-3475 (emphasis added).

ACTIVE 24612840v1 01/29/2014

costs" for the gas station.[146] Joppatowne's counsel, Mr. Fowler,

signed the Letter Agreement, and the parties incorporated it into the

Lease Amendment.[147]

3. On September 12, 2006, Mr. Fowler wrote to Pam Cala, Redner's

representative, and stated that "**Landlord is permitting Tenant to**

**use this area at no cost**."[148]

Consequently, the parties clearly intended that Redner's would construct the

gas station at its expense and then operate the gas station without paying any rent.

## 2. The parties incorporated the Letter Agreement into the Lease Amendment.

As set forth above, Redner's and Joppatowne agreed that Redner's would

pay for the construction of the gas station and then operate it without paying

rent.[149]  In fact, the parties incorporated this language directly into the Lease

Amendment.[150]

It is well-settled law that a contract exists when parties have a meeting of the

minds as to its material terms and consideration is exchanged.  See <u>Lopez v. XTEL</u>

---

[146]<u>See</u> J.A. Vol. X, Joint Exhibit 13, pp. 3973-3974 (emphasis added); J.A. Vol. V, pp. 2071-2072.
[147]<u>See</u> J.A. Vol. X, Joint Exhibit 14, p. 3975; J.A. Vol. V, pp. 2071-2072.
[148]<u>See</u> J.A. Vol. VIII, Plaintiff's Exhibit 40, pp. 3451-3452 (emphasis added).
[149]<u>See</u> J.A. Vol. VI, pp. 2470-2471; J.A. Vol. X, Joint Exhibit 13, pp. 3973-3974; J.A. Vol. V, pp. 2071-2072.
[150]<u>See</u> J.A. Vol. X, Joint Exhibit 14, p. 3975; J.A. Vol. V, pp. 2071-2072.

61

Construction Group, LLC, 796 F. Supp. 2d 693, 699 (D. Md. 2011). As to consideration, a party that relinquishes or forbears upon a legal right provides sufficient consideration to enforce a contract. See Chernick v. Chernick, 610 A.2d 770, 774-775 (Md. 1992).

Here, the Lease Amendment incorporates the March 10, 2006 Letter Agreement, which establishes that Redner's owes no rent for the gas station.[151] The Lease Amendment contains no provisions for the payment of any monies (e.g., rent or percentage rent) to Joppatowne, except that it requires Redner's to pay any increases in Joppatowne's real estate taxes caused by the gas station.[152] The Lease Amendment concludes: "All other terms, covenants provisions and conditions set forth in the Lease and the Letter Agreement are hereby reaffirmed in their entirety, except as expressly modified by the terms of this Amendment No. 1 to Lease."[153]

As for consideration, Redner's relinquished its legal right to terminate the Lease after Joppatowne failed to perform its contractual obligations by failing to finish the grocery store space in the time allotted.[154] This is legally sufficient consideration. See Chernick, 610 A.2d at 774-775 (finding sufficient consideration where a party relinquished a legal right).

---

[151]See J.A. Vol. X, Joint Exhibit 14, p. 3975; J.A. Vol. V, pp. 2071-2072.
[152]See J.A. Vol. X, Joint Exhibit 14, pp. 3975-3990.
[153]See id., pp. 3987-3988.
[154]See J.A. Vol. V, p. 1927; J.A. Vol. X, Joint Exhibit 12, pp. 3902-3972.

62

### 3. The Lease Amendment and Lease only require Redner's to pay percentage rent for the "Demised Premises," which does not include the gas station.

Joppatowne argues that it should receive rent on gas sales as percentage rent even though this suggestion contradicts the express terms of the Lease Amendment and the Lease.[155] In fact, the Lease itself provides for percentage rent only on "Gross Sales" from the "Demised Premises."[156] "Demised Premises" does not include the gas station.[157] To the contrary, "Demised Premises" is the Building (i.e., the supermarket) and the land underneath it.[158] The "Building" is limited to the "single-story supermarket building to be constructed according to plans and specifications to be developed for this particular location."[159] Thus, the Lease Amendment and Lease do not provide for payment of any rent, percentage or otherwise, for the gas station.

---

[155] See J.A. Vol. X, Joint Exhibit 12, pp. 3913-3914.
[156] See id.
[157] See id., pp. 3902-3903.
[158] See id.
[159] See id., p. 3905.

63

### 4. Joppatowne's own counsel acknowledged early in this lawsuit that Redner's owed no rent to Joppatowne for the gas station.

Earlier in this lawsuit, at a deposition of Ms. Herr, Joppatowne's counsel acknowledged that Redner's owed no rent for the gas station:[160]

> ATTORNEY KERR: Okay. I'm correct, am I not, that by this amendment Redner's obtained the consent of the landlord, Joppatowne, to put in a gasoline vending facility in the parking lot in front of its grocery store?
>
> MS. HERR: Yes.
>
> ATTORNEY KERR: Okay. **Am I correct that no additional rent was required of Redner's in consequence of this amendment to which the landlord agreed?**
>
> MS. HERR: **Correct.**[161]

This exchange seemed insignificant at the time because Redner's had never paid, and Joppatowne had never requested, any rent (annual or percentage) for the gas station.[162] It was only after months of litigation and days of trial that Joppatowne invented the theory that Redner's breached the Lease by allegedly failing to pay percentage rent on gas sales.[163] Consequently, the District Court properly found

---

[160]See J.A. Vol. V, pp. 1907-1916.
[161]See id., pp. 1914-1915 (emphasis added).
[162]See J.A. Vol. IV, Document No. 100-7, p. 1639.
[163]See id., Document No. 100, pp.1594-1616.

64

that the language of the Lease Amendment does not impose any rent obligations whatsoever on Redner's.

### C.  The District Court Properly Applied The Definitions Of "Butcher Shop" And "Seafood Shop" To Lapp's And All Fresh And These Terms Are Not Ambiguous.

The District Court's decision finding Lapp's and All Fresh to be a "butcher shop" and "seafood shop," respectively, should be affirmed because the District Court properly applied the unambiguous terms of the Lease.  First, the terms are not ambiguous, and parol evidence should not be considered.  Second, even if parol evidence is considered, such evidence supports the District Court's decision.

### 1.  Parol evidence should not be considered.

The District Court did not need to, and presumably did not, rely on parol evidence to determine that Lapp's and All Fresh were a "butcher shop" and "seafood shop," respectively, because these terms are not ambiguous.

Under Maryland law, parol evidence is not admissible to interpret contractual terms in an integrated agreement unless the terms are ambiguous.  See Fister ex rel. Estate of Fister v. Allstate Life Ins. Co., 783 A.2d 194, 205 (Md. 2001) (holding that "only when a term is reasonably susceptible to more than one meaning, do we consider extrinsic evidence"); Gordon v. Service of America, No. 95-3162, 1997 WL 414371, *2 (4th Cir. Jul. 23, 1997) (holding that, under Maryland law, "[a]mbiguity only exists if a reasonably prudent person could find

65

more than one meaning of a term, not when one of the parties simply disagrees as to the meaning of the term").

In its January 24, 2013 Opinion, the District Court correctly held that the definition of "butcher shop" was unambiguous:

> The Court rejects Joppatowne's argument that the Lease is ambiguous because it proscribes butcher shops but would permit a limited quantity of "fresh or frozen meats" to be sold. The three pertinent definitions of "food supermarket or grocery store" in sections 13.01(a)(ii)(2)-(4) include "Fresh or frozen meats" among the enumerated items that count under the 25% "in-store sales area" calculation. The Court finds that the Lease, as applied to Lapp's Fresh Meats, is not ambiguous. Lapp's Fresh Meats deals only in meat, and it meets any reasonable definition of a butcher shop.[164]

Joppatowne's argument is essentially that the Restrictive Use Covenant contains inconsistent provisions, and is therefore ambiguous. This is incorrect. Joppatowne admits that the Restrictive Use Covenant plainly prohibits a "food supermarket, butcher shop, seafood shop, or grocery store." Nevertheless, Joppatowne suggests that this prohibition is inconsistent with the later provision allowing "retail operators" of various size to sell fresh and/or frozen meat, so long as it does not exceed a certain percentage of their "in-store-sales-area."[165] Nothing is inconsistent, however, about (a) the general prohibition on "butcher shops" and

---

[164]See J.A. Vol. VI, p. 2486 N.49.
[165]See Joppatowne's Appeal Brief, pp. 40-42.

66

"seafood shops," and (b) an exception to the general prohibition allowing a certain amount of meat to be sold by non-butcher shops and non-seafood shops. As the other exceptions make clear, the parties intended the Restrictive Use Covenant to prevent destructive competition and to allow stores that merely sold competing products on a small scale, such as a drug store, pharmacy, or delicatessen.

### 2.     Parol evidence supports the District Court's ruling.

Not only did the Court properly find the "butcher shop" and "seafood shop" restrictions to be unambiguous, but even if they were ambiguous, there is no parol evidence in this case that changes the interpretation. First, Joppatowne never cites to any specific parol evidence to support its conclusions. Second, the evidence in the record shows that the parties carefully negotiated each Lease term, and the parties did not merely add "butcher shop" and "seafood shop" as part of "one descriptive phrase for the type of business activity to which [the Restrictive Use Covenant] applied."[166]

Joppatowne's counsel, Mr. Fowler, testified that there were no drafts of the Lease that defined the terms "butcher shop" or "seafood shop":

> Q:   Let me just refer to Article XIII.   During your negotiation of the Article XIII provisions, there was never a draft that contained the definition of butcher shop or seafood shop; is that correct?

---

[166]See Joppatowne's Appeal Brief, p. 42.

MR. FOWLER:  I am not aware of any draft that defined those terms.  I would say that numerous drafts and the final modified those terms.

Q:  Well, there is no reason why you did not put a definition of butcher shop or seafood shop in Article III, is there – Article XIII, is there?

MR. FOWLER:  Well, as to butcher shop, meat sales are permitted.  As to a seafood shop, I don't have a reason why there is not a definition of it.  You can't define every word in every document, and that's all it will be, is one big, long set of definitions.

Q:  You would agree that butcher shop could be defined as someone who sells raw meat, or someone who cuts up raw meat at the location, correct?

MR. FOWLER:  I think butcher shop connotes the preparation of the meat there.  That's how I view a butcher shop.[167]

Counsel for Redner's cross-examined Mr. Fowler regarding his understanding of "butcher shop":

Q:  But you would agree with me that other people would define it to include someone who just sells raw meat?

MR. FOWLER:  I don't know.  I wouldn't be surprised if somebody said that, but I don't agree with it.

Q:  Okay.

MR. FOWLER:  Especially in this context.

Q:  Well, let me refer you to your deposition, page 33.

---

[167]See J.A. Vol. III, pp. 1111-1112.

68

…

> Q:    Question, that would be a shop that sells raw meat in some form?
>        Answer, a butcher shop to me would not be limited to selling raw meat.  The concept of a butcher shop I think is historical, more than today, but it involves actually preparing the meat on the premises, is how I would define it, or other people would say, has fresh meat.
>        Did I read that correctly?
>
> A:    Yeah, and I don't think that's inconsistent with what I just said.  You asked if other people would say it. I said yes, they would, and I don't agree with them.  I think the proper definition involves the preparation, but I acknowledge that other people might say that selling fresh meats make you a butcher shop.  I don't think there is anything inconsistent.[168]

Thus, Mr. Fowler, Joppatowne's counsel, admitted that (1) no other documents defined "butcher shop," and (2)  the term "butcher shop" meant a place where meat was prepared and/or is understood by others to be a place that sells fresh meat.[169]

Accordingly, even if the Court considers parol evidence, under either definition applied by Mr. Fowler, the District Court's finding that Lapp's was a "butcher shop" within the meaning of the Lease should be affirmed.

---

[168]See J.A. Vol. III, pp. 1111-1113.
[169]See id.

69

**D.    The District Court Properly Entered The Permanent Injunction, And Redner's Was Not Required To Prove Irreparable Harm.**

On June 13, 2013, the District Court granted Redner's request for a permanent injunction, ordering Joppatowne to cause Lapp's and All Fresh (the "Infringing Vendors") to leave the Shopping Center.  As set forth below, Redner's met the elements for injunctive relief, and the District Court's June 13, 2013 Order should be affirmed.

**1.    Applicable Law**

**a.    Maryland law applies.**

State law governs the remedy of a permanent injunction when accorded by a federal court sitting in diversity.  See Capital Tool & Manufacturing Co., Inc. v. Maschinenfabrik Herkules, 837 F.2d 171, 172 (4th Cir. 1988).  A federal court with subject matter jurisdiction solely due to the diversity of the parties' citizenship "must determine and follow the probable remedial treatment [the plaintiff] would have received in a state court."  McLeod v. Stevens, 617 F.2d 1038, 1041 (4th Cir. 1980).

**b.    Permanent injunctive relief**

Under Maryland law, a plaintiff seeking a **permanent** injunction to enforce a covenant restricting the use of real estate need only show:  (1) the existence of the covenant, (2) a breach of the covenant by defendant, and (3) that the equities of

70

the case favor plaintiff.  See Chestnut Real Estate Partnership v. Huber, 811 A.2d 389, 397- 402 (Md. Ct. Spec. App. 2002) (holding that a plaintiff seeking a **permanent** injunction to enforce a covenant restricting the use of real estate need not show irreparable harm); Slice v. Carozza Properties, Inc., 137 A.2d 687, 694 (Md. 1958) (holding that a restrictive use covenant "is violated by the lessor's submission to the forbidden use by another tenant, when this use is contra to the terms of the lease agreement between the lessor and the other tenant, and that such a covenant may be enforced by injunction proceedings against the original lessor").

### c.      Specific performance

The Court of Appeals of Maryland has definitively established that injunctive relief is appropriate to obtain specific performance enforcing a restrictive use covenant against a landlord.  Freedman v. Seidler, 194 A.2d 778, 782 (Md. 1963).  "It is well settled in this State that a covenant in a lease to the effect that the tenant shall have the exclusive right of conducting a specified business on the leased premises may be injunctively enforced against both the landlord and a subsequent tenant of another part of the landlord's premises, who, at the time he entered into the lease, had notice of the right granted to the original tenant."  Id.  Moreover, specific performance "will usually be decreed, as a matter of course, where the contract is in its nature and circumstances unobjectionable."  Chestnut Real Estate, 811 A.2d at 401.

71

> **d.    The "irreparable harm" requirement is not applicable.**

In <u>Chestnut Real Estate</u>, plaintiff, a neighborhood advisory board, sought an injunction directing the developer of an assisted living community to remove a gardening shed from the assisted living community's property.  811 A.2d at 393. The developer argued that an injunction was not warranted because the advisory board had not shown irreparable harm.  <u>Id.</u>  The neighborhood advisory board proved the existence of the restrictive covenant and its breach by the developer, and the court issued the requested injunction.  <u>Id.</u>

On appeal, the Maryland Court of Special Appeals affirmed, holding that, for the violation of a restrictive use covenant affecting real property, injunctive relief "would issue with no greater showing than is required to obtain **specific performance**, with no requirement that irreparable injury be shown."  <u>Id.</u> at 401 (emphasis added).  The court acknowledged that injunctions typically require irreparable harm, but found that requirement inapplicable to restrictive use covenants related to real property.  <u>Id.</u>  The court reasoned that covenants affecting property are contractual in nature, and a suit to enforce them is in the nature of specific performance.  <u>Id.</u> at 398.  Specific performance does not require irreparable harm.  <u>Id.</u> at 399.

72

### 2. The District Court Properly Enjoined Joppatowne From Allowing The Infringing Vendors To Continue Operating.

Redner's succeeded on the merits of its case, as set forth in the Court's January 24, 2013 Opinion.[170]  Redner's was not required to show irreparable harm.[171]  Denying injunctive relief in this case would have caused more harm than granting it.  Finally, injunctive relief in this case is in the public interest.  Under these circumstances, Redner's was entitled to specific performance.  See Maryland–Nat'l, 386 A.2d 1216 at 1234.

#### a. Redner's succeeded on the merits.

As set forth above, and in the Order, Redner's succeeded on the merits of its case because the District Court held that Joppatowne violated the Restrictive Use Covenant by allowing Lapp's and All Fresh to operate within the Shopping Center.[172]

#### b. Redner's was not required to show irreparable harm.

As referenced above, under Maryland law, Redner's did not need to show irreparable harm to enforce the Restrictive Use Covenant.  See Chestnut Real Estate, 811 A.2d at 401.  To the contrary, Redner's was entitled to injunctive relief because it established (1) the existence of the Restrictive Use Covenant, (2) a

---

[170]See J.A. Vol. VI, pp. 2455-2496.
[171]See id., pp. 2687-2692.
[172]See id., pp. 2455-2496.

73

breach of the Restrictive Use Covenant by Joppatowne, and (3) that the equities of the case favored Redner's.[173]  Id. at 397-402.

### c.  Although Redner's was not required to show irreparable harm, Redner's suffered irreparable harm.

Even though Redner's was not required to show irreparable harm, Redner's did so through the testimony of Mr. O'Brien and the expert report and testimony of Mr. Suarez.[174]  These reports were supported by their testimony at trial that Redner's will lose over $2.2 million in lost profits, in addition to lost customers and goodwill.[175]

"[W]hen the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied."  Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 553 (4th Cir. 1994); General Parts Distribution, LLC v. St. Clair, No. 11–cv–03556–JFM, 2011 WL 6296746, *7 (D. Md. Dec. 14, 2011) (finding that "[w]hen the failure to grant preliminary relief creates the

---

[173]See J.A. Vol. VI, pp. 2687-2692.
[174]See J.A. Vol. VIII, Plaintiff's Exhibit 39, pp. 3388-3450; J.A. Vol. VII, pp. 2890-2900, 2904-2908; J.A. Vol. VII, pp. 3219-3221.
[175]See J.A. Vol. VIII, Plaintiff's Exhibit 39, pp. 3388-3450.

74

possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied").[176]

In Multi-Channel TV, the Fourth Circuit affirmed the district court's entry of a preliminary injunction when plaintiff demonstrated that it was likely to lose customers and goodwill.  Multi-Channel TV, 22 F.3d at 553.  The Fourth Circuit held that such a loss could not be valued and, therefore, could not be compensated by monetary damages, thereby warranting a finding of irreparable harm.  Id.

Here, Redner's demonstrated irreparable harm because Redner's established damages caused by destructive competition, including the loss of customers and goodwill, which cannot be compensated by money damages.[177]  See Multi-Channel TV, 22 F.3d at 553; St. Clair, 2011 WL 6296746.  Redner's cannot be made whole by the payment of monetary damages alone because (1) the damage to Redner's is ongoing and will continue as long as the Vendors remain,[178] and, if injunctive relief were denied, Redner's would be forced to renew its lawsuit against Joppatowne

---

[176]Although these cases applied federal law rather than Maryland law, the analysis is the same.  See, e.g., Maryland-Nat'l, 386 A.2d at 1234) ("irreparable injury is suffered whenever monetary damages are difficult to ascertain or are otherwise inadequate").

[177]See J.A. Vol. VIII, Plaintiff's Exhibit 39, pp. 3388-3450.

[178]Although the District Court shut down Lapp's and All Fresh, Lapp's reopened in the fall of 2013, and Redner's has filed a motion for contempt and for sanctions. Moreover, through this appeal, Redner's seeks the closure of Beiler's BBQ and Beiler's Baked Goods.

75

every few years, and (2) the damage suffered by Redner's is not merely financial, but also includes loss of reputation, marketing, and goodwill.[179]  See Multi-Channel TV, 22 F.3d at 553.  This damage to Redner's intangible assets is impossible to quantify and constitutes irreparable harm.  Id.

> ### d.    Greater injury would have resulted from refusing the injunction than from granting it.

As outlined above, if the District Court had denied the requested injunction, Redner's would have continued to suffer damages in the form of lost profits, marketing, and goodwill, as well as increased costs from re-litigating this matter to recover future damages.

Conversely, when the injunction was granted, Joppatowne did not suffer harm.  Rather, the District Court merely required Joppatowne to comply with its Lease obligations.  Indeed, any obligations Joppatowne has to JTF or the Vendors were undertaken with full knowledge of Joppatowne's pre-existing Lease obligations to Redner's and the corresponding risk that Redner's would enforce its rights under the Lease.[180]  In fact, Joppatowne knew Redner's relied on the Restrictive Use Covenant because Redner's previously exercised its rights under

_____

[179]See J.A. Vol. VIII, Plaintiff's Exhibit 39, pp. 3388-3450.
[180]See J.A. Vol. X, Joint Exhibit 18, pp. 3998-4002.

ACTIVE 24612840v1 01/29/2014

the Restrictive Use Covenant to preclude a Super Wal-Mart from opening in the Shopping Center.[181]

### e.    An injunction was in the public interest.

The District Court properly found that public policy weighed strongly in favor of granting an injunction because it fulfills the intentions of the contracting parties.  Under Maryland law, there is a strong public interest in upholding the intent of contracting parties through strict enforcement of contractual terms.  E.g., Maryland–National, 386 A.2d at 1229-1230.

Indeed, strict enforcement of contracts is in the public interest absent provisions "patently offensive" to the public good.  Id.  In Maryland–National, the court recognized that Maryland courts are reluctant to invalidate contracts because of "the public interest in having individuals exercise broad powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle."  Id.

In this case, Redner's asked the Court to enforce a clearly agreed upon contractual promise, which was consistent with the parties' intent.  Moreover, the

---

[181]See J.A. Vol. III, pp. 827-831; see also Plaintiff's Exhibit Nos. 2 and 3.

77

District Court specifically found that Lapp's and All Fresh violated the Restrictive Use Covenant.[182]

Maryland courts have frequently enforced Restrictive Use Covenants similar to the Restrictive Use Covenant in this case. <u>See</u>, <u>e.g.</u>, <u>Chestnut Real Estate</u>, 811 A.2d at 401. Thus, it was in the public interest to grant Redner's the injunctive relief it requested.[183]

---

[182]<u>See</u> J.A. Vol. VI, pp. 2484-2486.
[183]<u>See</u> <u>id.</u>, pp. 2471-2484.

78

IV.    **CONCLUSION**

For the reasons set forth above, Redner's respectfully requests that the Court affirm the District Court with respect to the issues raised by Joppatowne's appeals, and reverse the District Court regarding the issues raised by Redner's cross-appeal, and/or remand the matter to the District Court for a new trial on these issues.

Respectfully submitted,

**FOX ROTHSCHILD LLP**

Dated:  January 29, 2014        By:  */s/ John J. Miravich*
                                      John J. Miravich, Esquire
                                      Admitted to the Fourth Circuit
                                      747 Constitution Drive, Suite 100
                                      Exton, PA  19341
                                      Phone: (610) 458-3128
                                      Fax: (610) 458-7337
                                      jmiravich@foxrothschild.com
                                      *Attorneys for Plaintiff-*
                                      *Appellee/Cross-Appellant,*
                                      *Redner's Markets, Inc.*

79

## <u>LOCAL RULE 34(A) STATEMENT</u>

Redner's respectfully requests oral argument pursuant to Local Rule 34(a). Due to the number of issues raised by Joppatowne's appeals and Redner's cross-appeal, Redner's believes oral argument would assist the Court in considering this matter.

80

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), 32(a)(7)(C), and Local Rule 28.1(e)(2)(B) because the word count of this brief is 16,370.

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief was prepared in a proportionally spaced typeface using Microsoft Word, Times New Roman font, 14 point.

**FOX ROTHSCHILD LLP**

Dated:  January 29, 2014          By:   */s/ John J. Miravich*
                                            John J. Miravich, Esquire
                                            Admitted to the Fourth Circuit
                                            747 Constitution Drive, Suite 100
                                            Exton, PA  19341
                                            Phone: (610) 458-3128
                                            Fax: (610) 458-7337
                                            jmiravich@foxrothschild.com
                                            *Attorneys for Plaintiff-*
                                            *Appellee/Cross-Appellant,*
                                            *Redner's Markets, Inc.*

81

## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

| | |
|---|---|
| REDNER'S MARKETS, INC., | CIVIL ACTION |
| Plaintiff-Appellee/Cross-Appellant, | NO. 13-1766 |
| v. | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND (Case No. 1:11-cv-01864-RDB) |
| JOPPATOWNE G.P. LIMITED PARTNERSHIP, | |
| Defendant-Appellant/Cross-Appellee. | |

### <u>CERTIFICATE OF SERVICE</u>

I, John J. Miravich, Esquire, hereby certify that on January 29, 2014, I

served a copy of Plaintiff-Appellee/Cross-Appellant's Opening/Response Brief on

the following parties via the electronic case filing system and electronic mail:

Charles Kerr, Esquire
Kerr McDonald, L.P.
*Attorneys for Defendant-Appellant/Cross-Appellee,*
*Joppatowne G.P. Limited Partnership*

**FOX ROTHSCHILD LLP**

By: */s/ John J. Miravich*
John J. Miravich, Esquire

ACTIVE 24612840v1 01/29/2014